KIRK B. LENHARD
Nevada Bar No. 1437
PHILIP M. BALLIF
Nevada Bar No. 2650
TAMARA BEATTY PETERSON
Nevada Bar No. 5218
JONES VARGAS
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89109
Telephone: (702) 862-3300
Facsimile:   (702) 737-7705

LISA M. HOLUBAR *(Admitted Pro Hac Vice)*
KIRKLAND & ELLIS, LLP
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:  312/861-2000
Facsimile:  312/8612200

*Attorneys For Plaintiff/Counterdefendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SHUFFLE MASTER, INC.<br><br>                    Plaintiff,<br><br>     v.<br><br>YEHIA AWADA, and GAMING ENTERTAINMENT, INC.<br><br>                    Defendants. | CASE NO. CV-S-05-1112-RCJ-RJJ<br><br>EFILE<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SHUFFLE MASTER'S MOTION FOR PRELIMINARY INJUNCTION** |
| GAMING ENTERTAINMENT, INC., and YEHIA AWADA,<br><br>                    Counterclaim-Plaintiffs,<br><br>     v.<br><br>SHUFFLE MASTER, INC., and MARK YOSELOFF,<br><br>                    Counterclaim-Defendants. | |

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

<u>**TABLE OF CONTENTS**</u>

**I.   INTRODUCTION** ................................................................ 1

**II.   BACKGROUND FACTS** ...................................................... 2

    **A.   The Four Card Poker Trade Dress.** ........................................ 2

    **B.   Shuffle Master's Successful Placement Of Four Card Poker On Casino Floors.** ........................................................................... 3

    **C.   Shuffle Master Has Spent Significant Time And Money Advertising and Promoting The Four Card Poker Trade Dress.** ............................. 5

    **D.   The Defendants' Copycat Play Four Poker Game.** ......................... 7

**III.   ARGUMENT** .................................................................. 8

    **A.   Shuffle Master Is Likely To Succeed On The Merits Of Its Trade Dress Infringement Claim.** .......................................................... 9

        **1.   The Four Card Poker Trade Dress Is Protectable.** ................... 9

        **2.   The Four Card Poker Trade Dress Is Not Functional.** ............... 14

        **3.   The Defendants' Table Game Creates A Likelihood Of Confusion.** .......... 16

            *a.   Defendants' Infringing Trade Dress is Virtually Identical to Shuffle Master's.* .................................................... 18

            *b.   The Parties' Goods and Services are Identical.* ................... 19

            *c.   The Parties Use Identical Marketing Channels.* .................. 20

            *d.   Defendants Intended Their Play Four Poker Game to Be Associated or Confused with Shuffle Master's Four Card Poker Game.* .............. 21

            *e.   Shuffle Master Has a Strong Trade Dress.* ...................... 23

            *f.   Degree of Care.* ............................................. 23

            *g.   Actual Confusion and Likelihood of Expansion Are Not Relevant Here.* 24

    **B.   Shuffle Master Will Be Irreparably Harmed In The Absence Of A Preliminary Injunction.** ..................................................... 25

    **C.   The Defendants' Design-Around Felt Does Not Moot Shuffle Master's Requested Relief.** ........................................................... 26

**IV.   CONCLUSION** .............................................................. 27

i

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Adidas-Salomon AG v. Target Corp.*,
   228 F.Supp.2d 1192 (D. Or. 2002) ................................................................ 12

*AmBrit, Inc. v. Kraft, Inc.*,
   812 F.2d 1531 (11th Cir. 1987) ................................................................ 10

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ................................................................ passim

*Apple Computer, Inc. v. Formula Int'l Inc.*,
   725 F.2d 521 (9th Cir. 1984) ................................................................ 17

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
   174 F.3d 1036 (9th Cir. 1999) ................................................................ passim

*Caesars World, Inc. v. Milanian*,
   247 F. Supp. 2d 1171 (D. Nev. 2003) ................................................................ 21, 24

*Clicks Billiards Inc. v. Sixshooters Inc.*,
   251 F.3d 1252 (9th Cir. 2001) ................................................................ 9, 14, 15, 16

*El Pollo Loco, Inc. v. Hashim*,
   316 F.3d 1032 (9th Cir. 2003) ................................................................ 25

*Fabrica, Inc. v. El Dorado Corp.*,
   697 F.2d 890 (9th Cir. 1983) ................................................................ 14

*First Brands Corp. v. Fred Meyer, Inc.*,
   809 F.2d 1378 (9th Cir. 1987) ................................................................ 17, 22

*Ford Motor Co. v. Lapertosa*,
   126 F. Supp. 2d 463 (E.D. Mich. 2000) ................................................................ 26

*General Motors Corp. v. Let's Make a Deal*,
   223 F.Supp.2d 1183 (D. Nev. 2002) ................................................................ passim

*GoTo.com, Inc. v. The Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ................................................................ 19

*H.O. Sports Inc. v. Earth & Ocean Sports Inc.*,
   57 U.S.P.Q.2d 1927 (W.D. Wash. 2001) ................................................................ 26

*International Jensen, Inc. v. Metrosound U.S.A., Inc.*,
   4 F.3d 819 (9th Cir. 1993) ................................................................ 25

*Kendall-Jackson Winery Ltd. v. E&J Gallo Winery*,
   150 F.3d 1042 (9th Cir. 1998) ................................................................ 10

*K-Swiss, Inc. v. USA Aisiqi Shoes, Inc.*,
   291 F. Supp. 2d 1116 (C.D. Cal. 2003) ................................................................ 21

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    778 F.2d 1352 (9th Cir. 1985) ............................................................ 11

*Lindy Pen Corp. v. Bic Pen Corp.*,
    796 F.2d 254 (9th Cir. 1986) .............................................................. 19

*Lisa Frank, Inc. v. Impact International, Inc.*,
    799 F.Supp. 980 (D. Ariz. 1992) .................................................. 11, 16

*Locomotor USA, Inc. v. Korus Co., Inc.*,
    46 F.3d 1142, 1995 WL 7489 (9th Cir. 1995) (unpublished) ................. 11

*Lon Tai Shing Co. v. Koch + Lowy*,
    19 U.S.P.Q.2d 1081 (S.D.N.Y. 1990) ................................................. 26

*Malaytex USA, Inc. v. Colonial Surgical Supply, Inc.*,
    44 U.S.P.Q.2d 1291 (N.D. Cal. 1997) ................................................ 26

*McNeil-PPC v. Granutec, Inc.*,
    919 F.Supp. 198 (E.D.N.C. 1995) ...................................................... 14

*Monsieur Henri Wines, Ltd. v. Duran*,
    204 U.S.P.Q. 601 (TTAB 1979) ......................................................... 14

*Ocean Garden, Inc. v. Marktrade Co., Inc.*,
    953 F.2d 500 (9th Cir. 1991) .............................................................. 22

*Pacific Telesis v. Int'l Telesis Comms.*,
    994 F.2d 1364 (9th Cir. 1993) ....................................................... 22, 24

*Radical Products, Inc. v. Sundays Distributing*,
    821 F. Supp. 648 (W.D. Wash. 1992) ................................................. 25

*Rubbermaid Commercial Products, Inc. v. Contico Intern., Inc.*,
    836 F.Supp. 1247 (W.D. Va. 1993) .................................................... 25

*Sunburst Products, Inc. v. Derrick Law Co., Ltd.*,
    No. 89-56025, 1991 WL 1523 (9th. Cir. 1991) ................................... 11

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*,
    932 F.2d 1113 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992) ................... 10

*The Morningside Group Ltd. v. Morningside Capital Group, LLC*,
    182 F.3d 133 (2nd Cir. 1999) ............................................................ 24

*Thomas & Betts Corp. v. Panduit Corp.*,
    138 F.3d 277 (7th Cir. 1998) ............................................................. 13

*Time Inc. Magazine Co. v. Globe Communications Corp.*,
    712 F.Supp. 1103 (S.D.N.Y. 1989) .................................................... 12

*Urgent Gear, Inc. v. Savoia, et al.*,
    No. 3:01-CV-2190-D, 2001 WL 1577395 (N.D. Tex. Dec. 10, 2001)............. 9, 10

*Vision Sports, Inc. v. Melville Corporation*,

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

iii

888 F.2d 609 (9th Cir. 1989) ............................................................................. passim

*Vuitton et Fils S.A. v. J. Young Enters., Inc.*,
    644 F.2d 769 (9th Cir. 1981) ............................................................................. 14

*Wal-Mart Stores, Inc. v. Samara Bros.*,
    529 U.S. 205 (2000).............................................................................................. 9

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*,
    698 F.2d 786 (5th Cir. 1983) ............................................................................. 13

**Other Authorities**

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION,
    § 11:76 (4th ed. 1998)....................................................................................... 23

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.        INTRODUCTION

Plaintiff Shuffle Master, Inc. ("Shuffle Master") is an undisputed innovator and leader in the field of specialty casino table games.  In early September, 2005, at the G2E Gaming Convention at the Las Vegas Convention Center, Defendant Yehia Awada ("Awada") and his corporate alter-ego, Defendant Gaming Entertainment, Inc. ("GEI") unveiled a "new and improved" version of their Play Four Poker game that was nothing more than a blatant copy of one of Shuffle Master's most popular games, Four Card Poker.  Although imitation is often cited as a form of flattery, Shuffle Master was not pleased by the "compliment."  Thus, on September 12, 2005, Shuffle Master moved this Court for a Temporary Restraining Order ("TRO") to stop Awada and GEI (together the "Defendants") from copying Shuffle Master's trade dress in the appearance of the felt for the Four Card Poker table game.  On September 14, 2005 this Court entered the requested TRO, temporarily enjoining Defendants from marketing their copycat game.  The TRO remains in effect by a stipulation of the parties, approved by the Court.

Shuffle Master now seeks a preliminary injunction—limited but essential relief. For nearly four years, Shuffle Master has been the exclusive user of the distinctive trade dress embodied by its well-known Four Card Poker game.  Shuffle Master will be irreparably harmed if Defendants are allowed to offer a game with a virtually identical appearance in the marketplace.  In contrast, Defendants will suffer *no* harm if the status quo is maintained, because they are easily able to alter the appearance of their game so that it is not confusingly similar to Shuffle Master's trade dress.  Indeed, from 2002 until approximately August 2005, Defendants marketed a version of their "Play Four Poker," that did not use Shuffle Master's trade dress or trademarks.  More importantly, *as soon*

1

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

*as* this Court entered Shuffle Master's requested TRO, at the G2E Convention, Defendants revealed yet another version of their Play Four Poker felt that did not use Shuffle Master's trade dress or trademarks.

As Shuffle Master explains below and will further demonstrate at the preliminary injunction hearing, the Court should grant Shuffle Master's motion under basic and uncontroverted principals of trademark law as applied to the facts of this case.

## II.   BACKGROUND FACTS

### A.   The Four Card Poker Trade Dress.

Four Card Poker debuted in January of 2002.  In construction, the game consists of a felt overlay that is placed atop a standard semi-circular casino gaming table.  During play, the dealer stands behind the straight edge of the semi-circle, and the players sit along its circumference.  The game begins with each player making an initial "ante" bet; the players also have the option to add a side bet, for which Shuffle Master has coined the trademark "Aces Up."  Five cards are then dealt to each player, and once a player obtains his cards, he may add a second bet in an amount one to three times the ante.  The object of the game is to make the best four-card hand out of five cards.  These game play rules and the side Aces Up bet option for Four Card Poker have remained exactly the same since the inception of the game.  Ex. A, TRO Snow Aff. ¶4.

The Four Card Poker felt design is comprised of a number of distinctive visual features, including (1) the placement of three circles, arranged vertically, representing the location to place the various bets, at each player station; (2) the font within the three circles at each player station; (3) the printing of the names of the bets within the three circles at each player station, so that the letters of "Aces Up" and "Play 1x to 3x Ante"

2

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

touch the outer edges of the circles; (4) the identification of the bets, as "Aces Up," "Ante," and "Play 1x to 3x Ante" at each player station; (5) the placement of the pay tables at each player station beneath the vertically arranged circles; (6) the font of the "Aces Up" trademark at each player station; (7) the number of dots (eighteen) below the "Aces Up" trademark at each player station; (8) the font of the "Automatic Bonus" heading at the pay table for each player station; (9) the number of dots (eighteen) below "Automatic Bonus" at each player station; and (10) the font and wording of the text below the pay table at each player station ("Automatic Bonuses paid on Ante wager"). Ex. B, Snow Aff. ¶ 7.

The overall appearance of these individual design components in combination— which is in no way dictated by the rules of play—makes up the "Four Card Poker Trade Dress."  There are numerous alternate table game felt designs on the market.  However, with the exception of the Revised Awada Game, Shuffle Master is aware of no table game felt designs that look just like the Four Card Poker Trade Dress.  Ex. C, Scott Aff. ¶¶ 6, 7.  Indeed, Shuffle Master's Four Card Poker Trade Dress is inherently distinctive and has come to be associated with Shuffle Master exclusively.  Ex. D, TRO Gatlin Aff. ¶ 4 (observing that Four Card Poker is "well known among casinos in Nevada" and "associated" with Shuffle Master).

**B.    Shuffle Master's Successful Placement Of Four Card Poker On Casino Floors.**

Shuffle Master provides an array of table games choices to its casino customers who pay a monthly fee for leasing such games and then place the games on their casino floors.  Ex. C, Scott Aff. ¶ 3.  Placing a table game, such as Four Card Poker, on a casino

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

floor is not the end of the process.  Casinos will maintain only the most popular, as well as profitable, games on their gaming floors.  The turnover level for table games is high due to the fact that all of Shuffle Master's placements are made on a 30-day lease basis. If a game does not perform successfully for the casino, then there is a good chance that it will be removed.  Ex. C, Scott Aff. ¶ 4.  Not surprisingly, competition to obtain and maintain placements on casino floors is fierce among those in the gaming business. Shuffle Master considers itself in competition for casino floor space with any other product that can take up that same floor space, whether it be other specialty table games or slot machines.  The bottom line is that there are many options available to casino table game managers who are looking to fill their floor space, and Shuffle Master strives to be the best option by providing popular table games like Four Card Poker.  Ex. C, Scott Aff. ¶ 5.

Notwithstanding this competitiveness, the Four Card Poker table game is and has been overwhelmingly popular: Shuffle Master currently has approximately 230 placements of the game in casinos around the United States and abroad.  Ex. A, TRO Snow Aff. ¶¶18-19; Ex. C, Scott Aff. ¶¶ 8, 9.  That number is significant.  For example, by comparison, the game Casino War has been in the market for roughly 8 years and has only 50 installs.  Ex. C, Scott Aff. ¶ 8.  Four Card Poker is and has been a very profitable game for Shuffle Master.  Four Card Poker is the fourth highest income generating specialty table game for Shuffle Master and the fourth table game in the history of the business that is not a side bet or blackjack derivative to reach 200 or more installs.  Ex. C, Scott Aff. ¶ 9.

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

### C.   Shuffle Master Has Spent Significant Time And Money Advertising and Promoting The Four Card Poker Trade Dress.

Since 2002, Shuffle Master has continuously advertised and promoted the Four Card Poker Trade Dress in four distinct ways.  *First*, Shuffle Master participates in numerous gaming trade shows held throughout the United States, where it holds live demonstrations, displays posters depicting the Four Card Poker Trade Dress, and engages in media coverage and show-specific advertising, targeted to the audience attending the trade show.  Ex. E, Clark Aff. ¶ 3.  Shuffle Master also furnishes show attendees with a wide range of print marketing materials related to Four Card Poker, including rack cards (instructional 4" by 9" cards provided to casinos for player distribution), sell sheets (detailed product information sheets containing the game paytables, sample layout, and rules of play), brochures, and fliers with up-to-date installation numbers.  The printed materials highlight the Four Card Poker logo as well as the Four Card Poker Trade Dress, and, along with the live demonstrations and presentations, help to reinforce to attendees that Shuffle Master is the exclusive source of the Four Card Poker table game.

*Second*, separate and apart from its trade show appearances, Shuffle Master specifically targets individual key casino personnel, including table games managers and dealers, to stimulate interest in the Four Card Poker table game.  Ex. E, Clark Aff. ¶ 3.  Shuffle Master makes promotional sales calls throughout the year to such casino employees, and provides them with the same variety of Four Card Poker print marketing materials made available at industry trade shows.  Ex. E, Clark Aff.  ¶ 4.

*Third*, Shuffle Master markets and promotes the Four Card Poker table game electronically.  Shuffle Master's corporate website (located at URL

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

http://www.shufflemaster.com) contains detailed information about the game and allows internet users to download both the game sell sheet and a trial version of Four Card Poker computer game software.  Ex. E, Clark Aff. ¶ 15.  Shuffle Master has also developed an interactive "postcard" for the Four Card Poker table game, designed to educate current and potential customers as to the specific features of the game.  This electronic postcard includes an animated instruction on the rules of play, and is sent directly to customers by Shuffle Master's sales and marketing executives.  Both the website and the e-postcard prominently feature the distinctive Four Card Poker Trade Dress.  Ex. E, Clark Aff. ¶¶ 15-16.

**Fourth**, Shuffle Master markets the Four Card Poker table game through gaming industry publications.  Shuffle Master consistently releases information on the Four Card Poker table game to trade media, resulting in ample editorial coverage of the game.  These press releases are supported with professional photographs of the distinctive Four Card Poker Trade Dress (provided to the media upon request) to generate awareness and recognition of the game, and of Shuffle Master as the source of the game.  Ex. E, Clark Aff. ¶¶ 17-18.  Since November 1, 2004, Shuffle Master has also placed paid advertisements in trade publications such as *Casino Enterprise Management* and *Mississippi Gaming News* that showcase the Four Card Poker logo and include photographs highlighting the Four Card Poker Trade Dress.  Ex. E, Clark Aff. ¶¶ 7, 10.

These four types of marketing and promotion have resulted in significant expenditures of time and money by Shuffle Master.  For fiscal year 2005 alone, Shuffle Master spent nearly $30,000 in advertising and promoting Four Card Poker.  Ex. E, Clark Aff. ¶ 19.  But the costs incurred in promoting the Four Card Poker table game have been

6

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

fruitful, as it is one of Shuffle Master's most popular and successful games both in the United States and abroad.  Ex. A, TRO Snow Aff. ¶¶ 18-19; Ex. C, Scott Aff. ¶¶ 8, 9. Gaming industry members recognize the Four Card Poker Trade Dress as emanating from a single source, namely Shuffle Master.  Ex. F, Ostberg Dec. pp. 9, 10; Ex. D, TRO Gatlin Aff. ¶ 4 (observing that Four Card Poker is "well known among casinos in Nevada" and "associated" with Shuffle Master).

**D.      The Defendants' Copycat Play Four Poker Game.**

Like Shuffle Master, Defendants are in the business of developing and marketing specialty casino games, including table games.  *See* Docket Entry No. 26, Defendants' Answer to First Amended Complaint and Counterclaim ("Counterclaim") at Counterclaim ¶ 7.

In 2002, Defendants began distributing a table game known as "Play Four Poker" (the "Original Awada Game").  Any similarity between the Original Awada Game and Shuffle Master's Four Card Poker table game began and ended with the fact that both games involved bets based on a four card hand of poker.  The Original Awada Game had very different rules of play and a very different overall appearance from Shuffle Master's Four Card Poker.  Ex. A, TRO Snow Aff. ¶¶ 7, 13-17.

In August 2005 Defendants suddenly and significantly revised their Play Four Poker game, such that both its rules of play and its table appearance became ***identical*** to Shuffle Master's Four Card Poker (the "Revised Awada Game").  Ex. A, TRO Snow Aff. ¶ 7, 13-17.  *See generally* Ex. G, TRO Conaway Aff. (attaching photographs of Revised Awada game from G2E).  Although Defendants have no marketing plan, they have admitted that they intend "to market the [Revised Awada] game anywhere that there is

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

casino table gaming."   Ex. J, Defendants' Responses to Shuffle Master's First Interrogatories No. 4; Ex. K, Defendants' Response to Shuffle Master's First Requests for Production No. 7.

The only plausible explanation for the change to the Original Awada Game is that Defendants intended to capitalize on the popularity and success earned by Shuffle Master's Four Card Poker game over the last four years.   Hoping to siphon casino business away from Shuffle Master, the Defendants have touted the Revised Awada Game as a cheaper version of Shuffle Master's Four Card Poker—at the G2E Convention, Defendants boldly displayed promotional materials asking "WHY PAY MORE?" and hyped that their game was less expensive than Shuffle Master's.   Ex. H, Conaway Aff. ¶¶ 4, 5.

Defendants do not need to imitate the Four Card Poker Trade Dress.   As an initial matter, Defendants sold a Play Four Poker game for years without using the Four Card Poker Trade Dress.   Moreover, immediately upon entry of this Court's TRO, Defendants appeared at the G2E with a table felt for Play Four Poker that did not appropriate the Four Card Poker Trade Dress. Ex. H, Conaway Aff. ¶¶ 7, 8.

## III.   ARGUMENT

To succeed on its preliminary injunction motion, Shuffle Master must show "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor."   *Vision Sports, Inc. v. Melville Corporation*, 888 F.2d 609, 612 (9th Cir. 1989).  This "formulation represents two points on the sliding scale in which the required degree of irreparable harm increases as the probability of

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

success decreases." *General Motors Corp. v. Let's Make a Deal*, 223 F.Supp.2d 1183, 1190 (D. Nev. 2002). Shuffle Master not only meets the first test, it surpasses it. Shuffle Master is likely to succeed on the merits and will most certainly face irreparable harm in the absence of a preliminary injunction that stops the sale of Defendants' knock-off game.

### A.    Shuffle Master Is Likely To Succeed On The Merits Of Its Trade Dress Infringement Claim.

Trade dress "involves the total image of a product and may include features such as size, shape, color combinations, texture or graphics." *Vision Sports*, 888 F.2d at 613. Shuffle Master claims that the Revised Awada Game infringes its trade dress in the inherently distinctive overall appearance of the Four Card Poker table game felt. To prevail on its infringement claim, Shuffle Master must prove three things: that the Four Card Poker Trade Dress is (1) protectable and (2) nonfunctional, and that (3) that there is a likelihood of confusion between the Four Card Poker Trade Dress and the Revised Awada Game. *General Motors*, 223 F.Supp.2d at 1195. *See also Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001). Shuffle Master easily meets this burden.

### 1.    The Four Card Poker Trade Dress Is Protectable.

"Trade dress is protected if it is inherently distinctive or has acquired secondary meaning."[1] *General Motors Corp.*, 223 F.Supp.2d at 1195. In this case, the Four Card

---

[1]    If trade dress is claimed in a product design, as opposed to product packaging, it will only be protected upon a showing of secondary meaning. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216 (2000). The claimed trade dress here is a packaging trade dress, not product configuration trade dress, because it does not include the entire table itself, only the combination of elements on the felt that sits atop the table. *See, e.g., Urgent Gear, Inc. v.*

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

1  Poker Trade Dress has both inherent distinctiveness and secondary meaning.  First,

2  although some of the individual elements of the Four Card Poker Trade Dress may lack

3  distinctiveness on their own (*e.g.*, a circle design element), the innovative and arbitrary

4  combination of all of the elements together render the dress as a whole inherently

5  distinctive.  *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1120 (5th Cir.

6  1991), *aff'd*, 505 U.S. 763 (1992) (existence of individually non-distinctive elements

7  "does not eliminate the possibility of inherent distinctiveness in the trade dress as a

8  whole"); *Kendall-Jackson Winery Ltd. v. E&J Gallo Winery*, 150 F.3d 1042 (9th Cir.

9  1998) (relevant trade dress must not be dissected element by element; it must be

10  considered in its entirety); *General Motors*, 223 F. Supp. 2d at 1196 ("in trademark—and

11  especially trade dress cases—the mark must be examined as a whole, not by its

12  individual constituent parts"); *see also, e.g.*, *Urgent Gear*, 2001 WL 1577395

13  (preliminary injunction granted; various tags, crests, slogans, warnings and a button-

14  down shirt in combination resulted in inherently distinctive trade dress); *AmBrit, Inc. v.

15  Kraft, Inc.*, 812 F.2d 1531, 1536-37 (11th Cir. 1987) (trade dress as a whole with its

16  combination of elements—"square size, bright coloring, pebbled texture, polar bear and

17  sunburst images, and distinctive style of printing"—was inherently distinctive).

18      The inherent distinctiveness of the Four Card Poker Trade Dress is evidenced by

19  the fact that for nearly four years, it has been unique and exclusive to Shuffle Master.

20  Competitors' table games may share isolated elements with the Four Card Poker Trade

---

*Savoia, et al.*, No. 3:01-CV-2190-D, 2001 WL 1577395 at *3 (N.D. Tex. Dec. 10, 2001)
(combination of various tags, crests, slogans, warnings and a button-down shirt was
inherently distinctive "packaging" trade dress).

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

Dress, but Shuffle Master is not aware of even one other table game felt that includes each element in the same arbitrary combination as Shuffle Master—except of course for the Defendants' infringing Revised Awada Game.  Ex. C, Scott Aff. ¶¶ 6, 7. *See Lisa Frank, Inc. v. Impact International, Inc.*, 799 F.Supp. 980, 989 (D. Ariz. 1992).  ("While there are isolated similarities among the various products, they do not present an overall image consistent with the LFI look.").

Even if the Four Card Poker Trade Dress was not inherently distinctive, it would still be protectable because it has achieved secondary meaning.  Trade dress has secondary meaning "if the purchasing public associates it with a specific producer or source rather than with merely the product."  *General Motors Corp.*, 223 F.Supp.2d at 1195.  The Ninth Circuit has identified several factors this Court may look to in evaluating secondary meaning in the Four Card Poker Trade Dress, including:  (1) the length and manner of Shuffle Master's use of the Four Card Poker Trade Dress; (2) the exclusivity of that use; (3) the degree and manner of Shuffle Master's Four Card Poker advertising; (4) evidence of sales of Four Card Poker; and (5) Defendant's intent to copy. *General Motors Corp.*, 223 F.Supp.2d at 1195.  *See also Sunburst Products, Inc. v. Derrick Law Co., Ltd.*, No. 89-56025, 1991 WL 1523, at *3 (9th. Cir. 1991).  A final factor is whether actual purchasers associate the Four Card Poker Trade Dress with Shuffle Master.  *Id.*  Indeed, the Ninth Circuit has found that consumer surveys, though not required, may provide "the most persuasive evidence of secondary meaning" in a trade dress infringement suit.  *Locomotor USA, Inc. v. Korus Co., Inc.*, 46 F.3d 1142, 1995 WL 7489, *7 (9th Cir. 1995) (unpublished); *see also Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985).

Application of the above factors indisputably shows that Shuffle Master has acquired distinctiveness in its trade dress. With respect to the first two factors (length and exclusivity of use), Shuffle Master has used the Four Card Poker Trade Dress continuously and exclusively for nearly four years. Ex. C, Scott Aff. ¶ 6. Despite the plethora of table games on the market during that time, none shared the appearance of the Four Card Poker felt until the Defendants intentionally changed their felt design to mirror Shuffle Master's in August 2005. Ex. C, Scott Aff. ¶¶ 6, 7. With respect to the third and fourth factors (degree of advertising and evidence of sales), as noted above, Shuffle Master has extensively advertised and promoted its trade dress and has made significant "sales" of Four Card Poker by placing it more than 220 times in casinos across the country (and abroad). Ex. E, Clark Aff. ¶¶ 10, 18, 19; Ex. A, TRO Snow Aff. ¶¶18-19. Indeed, Defendants have admitted that "Shuffle Master is one of the largest suppliers of poker table games in the marketplace," and that Four Card Poker is one "of the most widely placed proprietary poker table games in the United States." Docket Entry 26, Counterclaim ¶ 11.

With respect to the fifth factor, Defendants' intent, it is notable that Defendants existed in the market with their own four card game and table felt design for years before switching to a design identical to the Four Card Poker Trade Dress. Courts have noted that proof of exact copying, like Defendants' here, can be sufficient to establish secondary meaning as there is no logical reason for the precise copying save an attempt to realize upon a prior user's secondary meaning. *See Adidas-Salomon AG v. Target Corp.*, 228 F.Supp.2d 1192, 1209 (D. Or. 2002) (citing cases); *Time Inc. Magazine Co. v. Globe Communications Corp.*, 712 F.Supp. 1103, 1108 (S.D.N.Y. 1989) ("in light of the

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

1   prior Celebrity covers, which used an entirely different type, creating a very different

2   cover format, one must ask why Celebrity changed its cover format to one that is

3   virtually the same as that of People's…. Such imitation warrants a finding of intentional

4   copying of trade dress."). As such, Defendants recent switch to a table felt design almost

5   identical to Shuffle Master's and their "WHY PAY MORE?" promotional materials

6   demonstrate Shuffle Master's strong secondary meaning.

7

8       Adding to the weight of Shuffle Master's already persuasive evidence of acquired

9   distinctiveness is that in a survey of table game managers (*i.e.*, casino personnel

10  responsible for leasing or purchasing table games) from a cross-section of casinos in the

11  United States, 35% associated the Four Card Poker game with a single source. Ex. F,

12  Ostberg Dec. pp. 9, 10.[2] *See also* Ex. D, TRO Gatlin Aff. ¶ 4. Such a percentage of

13  recognition is well within the level of association courts have found to be probative

14  evidence of secondary meaning. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d

15  277 (7th Cir. 1998) (a recognition rate of 30% was sufficient for the purpose of staving

16  off a summary judgment of no secondary meaning); *Zatarains, Inc. v. Oak Grove*

17  *Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir. 1983) (survey evidence of 23-28%

18  recognition in the mark "Fish-Fri" for a fried fish coating product, coupled with the

19  evidence of advertising and usage, tipped the scales in favor of a finding of secondary

22

23  _____

24  [2]   Noted survey expert Henry D. Ostberg of Admar Group Inc. conducted Shuffle Master's
25  survey. Ostberg contacted table game managers at casinos nationwide, asking if they would
    participate in the survey. If they agreed, Ostberg sent them photographs of Shuffle Master's
26  Four Card Poker game table felt. Ostberg then called the table game managers back and
    asked them a series of questions regarding the source of the table game shown in the
    photographs to determine if the Shuffle Master Trade Dress has secondary meaning.
27  Ostberg's declaration, with its accompanying appendices, is attached hereto as Exhibit F.

28

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

meaning); *McNeil-PPC v. Granutec, Inc.*, 919 F.Supp. 198 (E.D.N.C. 1995) (where 41% of respondents associated red and yellow capsules with a single brand and 38% identified that brand as Tylenol, the court found sufficient evidence of secondary meaning); *Monsieur Henri Wines, Ltd. v. Duran*, 204 U.S.P.Q. 601 (TTAB 1979) (37% of interviewees associated brand with background design; probative to corroborate finding of strong trademark in the design).

### 2.       The Four Card Poker Trade Dress Is Not Functional.

Trade dress is functional when the design of the dress "is essential to the use or purpose of the article," if the design "affects the cost or quality of the article," or if exclusive use of the dress by one party would "put competitors at a significant, non-reputation-related disadvantage."[3] *Clicks Billiards, Inc.*, 251 F.3d at 1258.  In contrast, trade dress is ***non-functional*** if it is a composite of features that are "arbitrarily affixed or included for aesthetic purposes."  *General Motors*, 223 F. Supp. 2d at 1196.   In evaluating functionality, the Ninth Circuit has emphasized that it is "crucial" that courts "focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create."  *Clicks Billiards*, 251 F.3d at 1259.  As such, the Ninth Circuit has identified four factors to consider in determining whether trade dress is functional:  (1) whether the design yields a utilitarian advantage,

---

[3]   The Ninth Circuit only recognizes utilitarian functionality and has not adopted so-called "aesthetic functionality."  *Clicks Billiards*, 251 F.3d at 1260.  *See also First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1382 n. 3 (9th Cir. 1987) ("In this circuit, the 'aesthetic' functionality test has been limited, *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 773 (9th Cir. 1981), if not rejected, *Fabrica, Inc. v. El Dorado Corp.*, 697 F.2d 890, 895 (9th Cir. 1983), in favor of the 'utilitarian' functionality test.").  Thus Shuffle Master does not address aesthetic functionality in this brief.

14

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

(2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Clicks Billiards*, 251 F.3d at 1260 (internal quotations omitted).

Applying each of these four factors to the overall impression of the Four Card Poker Trade Dress leads to the inescapable conclusion that the Four Card Poker Trade Dress is not functional. ***First***, and foremost, Shuffle Master's trade dress does not yield a utilitarian advantage. Instead, Shuffle Master's Four Card Poker table felt designer chose design elements that would combine to create a distinctive visual appearance. Ex. B, Snow Aff. ¶¶ 7, 9 . The designer could have chosen any number of different elements and still have presented Shuffle Master with a table felt appropriate for use with a poker game using the same rules of play. Ex. B, Snow Aff. ¶ 8. In other words, the purpose of the game did not dictate the design.

***Second***, there are nearly limitless alternative designs for specialty table game felts. Ex. B, Snow Aff. ¶ 8; Ex. C, Scott Aff. ¶¶ 6, 7. That is powerful evidence that the Four Card Poker Trade Dress is not functional. *General Motors Corp.*, 223 F.Supp.2d at 1196 (finding vehicle trade dress non-functional and explaining "there are ample alternative designs available to defendants as evidenced by the current size of the sports utility vehicle market"). *Clicks Billiards*, 251 F.3d at 1261 ("Clicks, we conclude, presented sufficient evidence of the arbitrariness and non-functional nature of its design decisions and the availability of alternative designs to clear the summary judgment hurdle.") Simply put, because the "Defendants have available to them a multitude of design alternatives that can be utilized in an endless number of combinations [they] can

15

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

effectively compete in the market without simulating the [Shuffle Master] trade dress." *Lisa Frank, Inc. v. Impact International, Inc.*, 799 F.Supp. 980, 987.  The existence of alternative designs supports a finding of non-functionality.

**Third**, in advertisements and promotions, Shuffle Master does not tout the felt for Four Card Poker as having any utilitarian benefits; it does not have any such benefits. *See* Ex. E, Clark Aff. ¶ 20.  Instead, the promotional materials highlight the appearance of the felt but tout only the popularity of the game based on the rules of play and frequency of wins.  *See* Ex. E, Clark Aff. ¶¶ 10, 11, 15.

**Fourth**, the overall design selected by Shuffle Master's designer and used by Shuffle Master for the past four years is not any easier or cheaper to make than any other felt design.  Ex. B, Snow Aff. ¶ 9.  This is established by the fact that shortly after this Court's entry of a TRO, the Defendants appeared at the G2E with a felt design for their Play Four Poker that did not appropriate the distinctive overall appearance of Shuffle Master's Four Card Poker Trade Dress.  Ex. H, Conaway Aff. ¶¶ 7, 8.

### 3.      The Defendants' Table Game Creates A Likelihood Of Confusion.

Likelihood of confusion is the "most important element" of the three components of a successful trade dress infringement claim.  *Clicks*, 251 F.3d at 1264.  A likelihood of confusion exists when the similarity of the parties' dress is likely to confuse customers about the source of the products.  *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999).  In other words, confusion is likely here if those viewing Defendants' accused Play Four Poker trade dress will probably assume that Play Four Poker is somehow associated with Shuffle Master.

16

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

*Clicks*, 251 F.3d at 1265.  In evaluating whether there is a likelihood of confusion, courts must look to the "total image of a product," *Vision Sports, Inc.*, 888 F.2d at 613—*i.e.*, the "total effect of the defendant's product and package on the eye and mind of an ordinary purchaser." *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1384 (9th Cir. 1987).

Analysis of likelihood of confusion in a Lanham Act trade dress infringement case involves consideration of several factors, often referred to in the Ninth Circuit as the "Sleekcraft factors": (1) similarity of the parties' trade dress; (2) similarity of the parties' goods and services; (3) marketing channels used; (4) the alleged infringer's intent in selecting the accused trade dress; (5) strength of the protected trade dress; (6) the type of goods and degree of care exercised by purchasers; (7) evidence of actual confusion; and (8) likelihood of expansion of the product lines.  *See Brookfield*, 174 F.3d at 1054 (referring to eight "Sleekcraft factors" and granting preliminary injunction); *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) (identifying factors in trademark infringement context); *Vision Sport,* 888 F.2d at 616 (holding that same factors are to be considered in trade dress infringement case).

In considering Shuffle Master's motion for a preliminary injunction, this Court is not required to consider all eight of the Sleekcraft factors.  *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 526 (9th Cir. 1984) (noting that in granting a preliminary injunction, the parties will not have had sufficient opportunity to fully develop and present their cases, and the court will have only a brief opportunity to examine the *Sleekcraft* factors) (internal citations omitted).  Nevertheless, even at this early stage of the case, it is clear that a majority of the likelihood of confusion factors

weigh in favor of Shuffle Master, establishing that Shuffle Master is highly likely to succeed on the merits.

<strong><em>a.      Defendants' Infringing Trade Dress is Virtually Identical to Shuffle Master's.</em></strong>

Certain of the Sleekcraft factors are "much more important than others," and while it is therefore possible to reach a conclusion with respect to likelihood of confusion after considering only a "subset of the factors," the similarity of the parties' trade dress "will always be an important factor." *Brookfield*, 174 F.3d at 1054. In considering this factor, the trade dress at issue must be considered in its entirety and as it is encountered in the marketplace. *Id*.

In this case, a simple visual comparison of the parties' games shows that the layout of the Revised Awada Game is nearly identical to that of Shuffle Master's Four Card Poker Game in detail and appearance. Ex. G, TRO Conaway Aff. ¶¶ 4, 5; Ex. A, TRO Snow Aff. ¶¶13-15. Furthermore, the layout of the text on the Revised Awada Game, including the font and the placement of design elements, is identical to Shuffle Master's Four Card Poker. Specifically:

- The wording for the Layout on the Revised Awada Game, "Aces Up," is identical to the wording on Four Card Poker;

- The term "Automatic Bonus," and phrase "Automatic Bonus is paid on Ante Wager," both previously unique to Four Card Poker, now each appear on the Revised Awada Game;

- Four Card Poker has a pay table next to the dealer for the dealer's benefit, and this same pay table layout now appears on the Revised Awada Game;

- The layout on the Four Card Poker felt ***contains 2 printer's errors***: the words "Aces Up" and "Play 1x to 3x Ante" were not completely printed within their respective circles on the Four Card Poker layout. The ***Revised Awada Game contains these identical errors***.

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

18

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

The only difference between the Revised Awada Game and Shuffle Master's Four Card Poker Game is that the displayed odds for "3 of a kind" are slightly different—8 to 1 vs. 7 to 1.  Ex. A, TRO Snow Aff. ¶ 14.  But the law is clear that such "trivial distinctions" are unimportant when two products are otherwise "glaringly similar." *GoTo.com, Inc. v. The Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). Furthermore, when considering this Sleekcraft factor, similarities are always weighed more heavily than differences.  *Id*.  This first factor thus weighs strongly in favor of Shuffle Master.

### b.      The Parties' Goods and Services are Identical.

This factor, which seeks to determine whether the parties directly compete, is another Sleekcraft factor that is "always" important.  *Brookfield*, 174 F.3d at 1054-55; *GoTo.com*, 202 F.3d at 1206 (relatedness of goods is a "controlling Sleekcraft consideration").   The law recognizes that competitive, related goods and services are more likely than unrelated goods to confuse the public.  *Brookfield*, 174 F.3d at 1055; *AMF*, 599 F.2d at 350.  For this reason, the Ninth Circuit has held that when virtually identical trade dress is used in connection with identical products or services, "likelihood of confusion [will] follow as a matter of course."  *Id.* at 1056 (emphasis added), citing *Lindy Pen Corp. v. Bic Pen Corp*., 796 F.2d 254, 256-57 (9th Cir. 1986) (finding likely confusion based solely on similarity of the marks and products, even though the six other likelihood of confusion factors all weighed against a finding of likelihood of confusion).

In this case, Defendants have ***admitted*** that the parties are direct competitors offering identical products.  Docket Entry 26, Counterclaim ¶ 7; *see General Motors*, 223 F. Supp. 2d at 1193 (identical products are "related goods"), quoting *AMF*, 599 F.2d at

19

1    348 n. 10.  Furthermore, the evidence in this case establishes that the Defendants have

2    made at least four attempts to sway Shuffle Master's customers to switch from Four Card

3    Poker to the Revised Awada Game.  Ex. I, TRO Konicek Aff. ¶ 3-6; Ex. A, TRO Snow

4    Aff. ¶¶ 8-10.  There can be no more convincing evidence that the parties' games are

5    related and directly competitive than that the Defendants have offered their own game as

6    a cheap replacement for Shuffle Master's Four Card Poker Game, including by

7    advertising it with the slogan "Why Pay More? Same Rules As Our Competitor's 4 Card

8    Poker Game $300!!!."  Ex. H, Conaway Aff. ¶¶ 4, 5.  This factor supports a likelihood of

9    confusion.

10

11              c.       *The Parties Use Identical Marketing Channels.*

12         This factor, together with relatedness of goods and services and similarity of the

13   trade dress, make up "the controlling troika" or "most crucial body of the Sleekcraft

14   analysis."  *GoTo.com*, 202 F.3d at 1205, 1207.  Although Defendants have no marketing

15   plan, they have admitted that they intend "to market the game anywhere that there is

16   casino table gaming."   Ex. J, Defendants' Responses to Shuffle Master's First

17   Interrogatories No. 4; Ex. K, Defendants' Response to Shuffle Master's First Requests

18   for Production No. 7.  Defendants' intent to market to casinos is further evidenced by

19   their presence at the G2E.  Shuffle Master also participates in gaming shows, including

20   the G2E, to market its products to casinos.  Ex. E, Clark Aff. ¶ 3.  Furthermore, Shuffle

21   Master markets its games in part by maintaining direct communication with casino

22   personnel, and the Defendants have similarly directly contacted various casinos in an

23   effort to convince them to substitute the Revised Awada Game for Shuffle Master's Four

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

1   Card Poker Game.  Ex. I, TRO Konicek Aff. ¶¶ 3-6; Ex. A, TRO Snow Aff. ¶¶ 8-10.

2   Thus this factor again weighs heavily in favor of Shuffle Master.

3               **d.      Defendants Intended Their Play Four Poker Game to Be**
                          **Associated or Confused with Shuffle Master's Four Card**
4                         **Poker Game.**

5           If an accused infringer knowingly adopts a mark similar to another's, "courts will

6   presume that it can achieve its purpose in deceiving the public."  *Caesars World, Inc. v.*

7   *Milanian*, 247 F. Supp. 2d 1171, 1200 (D. Nev. 2003) (emphasis added), citing *AMF*, 599

8   F.2d at 354.  To swing this factor its way, Shuffle Master is not required to show bad acts

9   by the defendant; it need merely establish that the Defendants adopted a similar trade

10   dress with actual or constructive knowledge of Shuffle Master's Four Card Poker Trade

11   Dress.  *Brookfield*, 174 F.3d at 1059 ("This factor favors the plaintiff where the alleged

12   infringer adopted his [trade dress] with knowledge, actual or constructive, that it was

13   another's") (internal citations omitted).  The Defendants were aware of Shuffle Master's

14   Four Card Poker dress, given Shuffle Master's strong reputation in the gaming industry

15   and the popularity of the Four Card Poker Game, which Shuffle Master has marketed for

16   the past four years.  Ex. D, TRO Gatlin Aff. ¶ 4; Ex. A, TRO Snow Aff. ¶ 19.  That fact,

17   when coupled with the striking similarity of the parties' trade dress, is enough to infer

18   that the Defendants intended to cause confusion.  *See K-Swiss, Inc. v. USA Aisiqi Shoes,*

19   *Inc.*, 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) (intent to confuse consumers may be

20   inferred where the plaintiff has a "strong reputation" and the trade dresses are very

21   similar).

22           The most "damning" evidence that the Defendants intended for their game to be

23   associated with Shuffle Master's is that after years on the market with the Original

21

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

Awada Game, Defendants redesigned the game to make it nearly indistinguishable from Shuffle Master's Four Card Poker table game. *See Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 507 (9th Cir. 1991) (finding intent to be "the most damning element" against defendant, where it was shown that defendant changed its original "very distinguishable" trade dress to mimic plaintiff's trade dress, and affirming grant of preliminary injunction).

"A showing that defendant intended to copy plaintiff's trade dress is entitled to substantial weight." *Vision Sports*, 888 F.2d at 616.  Thus, if similar trade dress is adopted with the intent of deriving "benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is confusing similarity." *First Brands*, 809 F.2d at 1385 (defendant's intent in adopting trade dress is a "critical factor") (emphasis added); *see also Pacific Telesis v. Int'l Telesis Comms.*, 994 F.2d 1364, 1369 (9th Cir. 1993) (same; upholding injunction where district court found that the defendant intended to "benefit from the goodwill and reputation acquired by [the plaintiff]"); *General Motors*, 223 F. Supp. 2d at 1194 (factor weighed in favor of confusion where defendant "desired to link [its] product to plaintiff's in order to attract buyers").  Because the Defendants acted with intent that the public would replace Shuffle Master's Four Card Poker with the Revised Awada Game, this factor by itself is probably enough to establish a likelihood of confusion.  *First Brands*, 809 F.2d at 1385.  When viewed in tandem with the three previously-discussed Sleekcraft factors, a likelihood of consumer confusion is inescapable.

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

### e.      Shuffle Master Has a Strong Trade Dress.

When the products at issue are closely related and the accused trade dress is nearly identical, as here, the strength of the Plaintiff's trade dress is "of diminished importance in the likelihood of confusion analysis." *Brookfield*, 174 F.3d at 1058 (holding that while the Plaintiff's mark fell "on the weak side of the spectrum," a likelihood of confusion was nonetheless compelled in light of the similarity between the parties' products and marks), citing 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 11:76 (4th ed. 1998) ("Whether a mark is weak or not is of little importance where the conflicting mark is identical and the goods are closely related"). Nevertheless, Shuffle Master has introduced credible evidence that its Four Card Poker Trade Dress is strong and distinctive. *See* Section III.A.1., *infra*; Ex. D, TRO Gatlin Aff. ¶ 4 (observing that Four Card Poker is "well known among casinos in Nevada" and "associated" with Shuffle Master); Ex. A, TRO Snow Aff. ¶¶ 18-19 (noting reputation of game, revenue produced by it, and marketing expenses incurred in promoting it). This factor weighs in favor of Shuffle Master.

### f.      Degree of Care.

When assessing the likelihood of confusion, the standard used by the courts is that of the "typical buyer exercising ordinary caution." *AMF*, 599 F.2d at 353. While the average purchaser of a product is expected to be "more discerning—and less easily confused—when he is purchasing expensive items," the Ninth Circuit has recognized that "confusion may often be likely even in the case of expensive goods sold to discerning customers." *Brookfield*, 174 F.3d at 1060. Indeed, the degree of care factor is overshadowed where, as here, other factors weigh strongly in favor of a likelihood of

confusion.  *See, e.g., Pacific Telesis*, 994 F.2d at 1369 (degree of care unimportant where "considered as a unity, the constellation of facts found by the district court coheres in the ultimate factual finding of likelihood of confusion"); *The Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 143 (2nd Cir. 1999) ("[i]t is clear in all events that when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion") (internal citations and quotations omitted).  This factor weighs slightly in favor of Shuffle Master.

### g.   *Actual Confusion and Likelihood of Expansion Are Not Relevant Here.*

The last two Sleekcraft factors do not merit extensive discussion because they are irrelevant to this case at this time.  *General Motors*, 223 F. Supp. 2d at 1194 (finding these factors "minor considerations").  First, actual confusion is not relevant here because Shuffle Master promptly brought this suit as soon as the Defendants introduced their infringing Revised Awada Game into the market.  *See Brookfield*, 174 F.3d at 1060 (finding actual confusion irrelevant under similar circumstances); *see also Caesars*, 247 F. Supp. 2d at 1199 (noting that a requirement of actual confusion "where there has been insignificant commercial activity by the infringer would work to penalize the trademark owner for taking prompt steps to protect his/her rights").  Second, the "likelihood of expansion in product lines factor is relatively unimportant where [as here] two companies already compete."  *Brookfield*, 174 F.3d at 1060.

/

/

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

**B.   Shuffle Master Will Be Irreparably Harmed In The Absence Of A Preliminary Injunction.**

In trademark infringement cases, irreparable injury is ordinarily presumed once the plaintiff has established a likelihood of confusion.  *See El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003) (affirming preliminary injunction); *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609; *General Motors Corp.*, 223 F.Supp.2d at 1196-97. Given the strength of Shuffle Master's showing on the merits of its case, irreparable harm should be presumed.

Nonetheless, Shuffle Master can demonstrate irreparable harm even absent a presumption.   If Defendants are permitted to continue marketing their cheap substitutions, Shuffle Master will likely lose business and business opportunities, and its reputation will be harmed—why would casinos lease or purchase both Shuffle Master's and Defendants' game tables when the tables look nearly identical and Defendants offer theirs at bargain basement prices?  *Radical Products, Inc. v. Sundays Distributing*, 821 F. Supp. 648, 651 (W.D. Wash. 1992).   On the flipside, the Defendants' unfair acts— offering identical copies of Shuffle Master's game, hyping those knock-offs as less than 1/3 the price—will furnish Defendants with undeserved market contacts and business. Put another way, it is Shuffle Master who created the demand for Four Card Poker, and now that gaming consumers want to play that game and casinos therefore want to offer it, Defendants hope to ride Shuffle Master's coattails, supplanting Shuffle Master's game with their copycat, cut-rate game.  The resulting harm to Shuffle Master simply could not be repaired.  *Rubbermaid Commercial Products, Inc. v. Contico Intern., Inc.*, 836 F.Supp.

25

1247, 1257 (W.D. Va. 1993) (preliminary injunction granted against trade dress infringer where "[t]he contacts [defendant] could build in the market pending the outcome of this case would likely endure even if this court ultimately decided permanently to enjoin [defendant].... That is a harm this court would be without power to repair.")

## C.   The Defendants' Design-Around Felt Does Not Moot Shuffle Master's Requested Relief.

As soon as this Court entered a TRO against the Defendants infringing activities, the Defendants appeared at the G2E with a re-designed table felt for their Play Four Poker game table.  Ex. H, Conaway Aff. ¶¶ 7,8.  Shuffle Master anticipates that the Defendants will attempt to avoid a preliminary injunction, in part, by arguing to this Court that they have voluntarily ceased their infringing behavior.  But in the absence of a preliminary injunction, there is nothing to prevent Defendants from returning to their infringing table felt, and courts have repeatedly held that a voluntary cessation of infringement does not moot the need for injunctive relief.  *H.O. Sports Inc. v. Earth & Ocean Sports Inc.*, 57 U.S.P.Q.2d 1927 (W.D. Wash. 2001) (preliminary injunction granted even when defendant voluntarily ceases infringing activities since voluntarily cessation is not ground for denial of injunction); *Ford Motor Co. v. Lapertosa*, 126 F. Supp. 2d 463 (E.D. Mich. 2000) (preliminary injunction awarded against adverse use of domain name despite defendant's cessation of conduct); *Malaytex USA, Inc. v. Colonial Surgical Supply, Inc.*, 44 U.S.P.Q.2d 1291 (N.D. Cal. 1997) (preliminary injunction issues despite defendant's proffered cessation of offending practices); *Lon Tai Shing Co. v. Koch + Lowy*, 19 U.S.P.Q.2d 1081, 1109 (S.D.N.Y. 1990) (bare promise to forebear enjoinable conduct not basis for denial of injunctive relief).  Further, Shuffle Master

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

offered to resolve the need for this briefing and argument upon Defendants' stipulation that it would agree to cease marketing/selling its offensive table felt—Defendants refused.  Thus, this issue is ripe for determination.

## IV.   CONCLUSION

For the foregoing reasons, Shuffle Master respectfully requests that this Court enter an Order preliminarily enjoining Defendants from making or selling infringing table games otherwise deceptively or unfairly competing with Shuffle Master.

\*      \*      \*

RESPECTFULLY SUBMITTED this 27th day of February, 2006.

/
/
/
/

**JONES VARGAS**

By: _____/s/_____
  KIRK B. LENHARD
  Nevada Bar No. 1437
  PHILIP M. BALLIF
  Nevada Bar No. 2650
  TAMARA BEATTY PETERSON
  Nevada Bar No. 5218
  3773 Howard Hughes Parkway
  Third Floor South
  Las Vegas, Nevada 89109

  LISA M. HOLUBAR *(Admitted Pro Hac Vice)*
  KIRKLAND & ELLIS, LLP
  200 East Randolph Drive
  Chicago, Illinois  60601

  *Attorneys For Plaintiff*

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jones Vargas
3773 Howard Hughes Parkway - Third Floor South
Las Vegas, Nevada 89109
Tel: (702) 862-3300 Fax: (702) 737-7705

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on the 27th day of February, 2006 and pursuant to

FRCP 5(b), I served via electronic service and/or deposited for mailing in the U.S. Mail a

true and correct copy of the foregoing Shuffle Master's Memorandum in Support of its

Motion for Preliminary Injunction, postage prepaid and addressed to:

DAVID N. MAKOUS, ESQ.
Lewis Brisbois Bisgaard & Smith LLP
221 North Figueroa Street, Suite 1200
Los Angeles, CA  90012
Facsimile No. 213/250-7900

SHERI SCHWARTZ, ESQ.
Lewis Brisbois Bisgaard & Smith LLP
400 South Fourth Street, Fifth Floor
Las Vegas, Nevada  89101
Facsimile No. 893-3789

*Attorneys for Defendants*

_____
/s/
Paula Kay, an employee of Jones Vargas

28