1  TAMARA BEATTY PETERSON (Bar No. 5218)
   JONES VARGAS
2  3773 Howard Hughes Parkway
   Third Floor South
3  Las Vegas, Nevada 89109
   Telephone: (702) 862-3300
4  Facsimile:  (702) 737-7705

5
   BARRY F. IRWIN (Bar No. 9068)
6  JAMI A. JAROSCH
   *(Admitted Pro Hac Vice)*
7  KIRKLAND & ELLIS, LLP
   200 East Randolph Drive
8  Chicago, Illinois 60601
   Telephone:  (312) 861-2000
9  Facsimile:   (312) 861-2200

10 *Attorneys for Shuffle Master, Inc. and*
   *Counter-Defendant Mark Yoseloff*
11

12              **UNITED STATES DISTRICT COURT**
13                  **DISTRICT OF NEVADA**

14 SHUFFLE MASTER, INC.                          CASE NO. CV-S-05-1112-RCJ-RJJ

15                Plaintiff,

16        v.

17 YEHIA AWADA, and GAMING
   ENTERTAINMENT, INC.

18                Defendants.                     **SHUFFLE MASTER'S MOTION FOR**
                                                  **SUMMARY JUDGMENT NO. 2 ON**
19 ───────────────────────────────               **DEFENDANTS' COUNTERCLAIMS AND**
                                                  **MEMORANDUM OF POINTS AND**
20 GAMING ENTERTAINMENT, INC., and               **AUTHORITIES IN SUPPORT THEREOF**
   YEHIA AWADA,
21
                Counterclaim-Plaintiffs,
22
          v.
23
   SHUFFLE MASTER, INC., and MARK
24 YOSELOFF,

25                Counterclaim-Defendants.

26

27

28

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES............................................................................................iii

BACKGROUND.......................................................................................................... 1

I.     INTRODUCTION........................................................................................... 1

II.    FACTUAL BACKGROUND........................................................................... 2

    A.    Defendants Factual Allegations Concern Antitrust Allegations and
           Claims Based on Allegedly False Statements.......................................... 2

    B.    Defendants Did Not Obtain Key Evidence, Nor Provide Timely
           Responses to Shuffle Master's Discovery. ............................................ 3

III.    LEGAL STANDARD...................................................................................... 5

ARGUMENT............................................................................................................... 6

IV.    DEFENDANTS CANNOT ESTABLISH THAT SHUFFLE MASTER
       VIOLATED ANY ANTITRUST LAW ........................................................ 6

    A.    Defendants' Allegations Fail to Satisfy Their Burden of Proof
           Regarding Their Antitrust Claims. ......................................................... 6

    B.    Defendants Cannot Prove What the Relevant Market Is, and Shuffle
           Master Has No Market Power in Any Relevant Market. ........................... 8

          1.    No Reasonable Jury Could Conclude That the Relevant
                  Market is "Novelty Games," "Novelty Poker Variation
                  Games," "Poker Table Games" or Any of the Other Market
                  Definitions Put Forth by Defendants........................................ 8

                a.    Even if Defendants Can Establish the Relevant
                        Market, Defendants Have Produced No Evidence of
                        Shuffle Master's Market Power..............................10

          2.    Shuffle Master Did Not Commit Knowing and Willful Fraud
                  in Obtaining the '759 Patent.................................................11

          3.    Shuffle Master Did Not Engage in Other Improper
                  Anticompetitive Activity. .......................................................14

                a.    Shuffle Master's Alleged Offers to Customers, Even
                        if True, are Not Anticompetitive Acts..................................15

                b.    Without Evidence That Shuffle Master Filed
                        Objectively and Subjectively Baseless Lawsuits,
                        Defendants Allegations That Shuffle Master Copied
                        Other Company's Games Then Threatened or Filed
                        Lawsuits Do Not Support a Section 2 Claim......................16

**TABLE OF CONTENTS** *(Continued)*

<u>Page</u>

c.     Shuffle Master's Letters to Customers, Which Provided Truthful Information, Cannot Serve as a Basis for an Antitrust Action. .............................18

V.     DEFENDANTS HAVE FAILED TO ESTABLISH THE NECESSARY ELEMENTS OF UNFAIR COMPETITION UNDER THE LANHAM ACT......................18

    A.     The Statements in Shuffle Master's Correspondence Were Not False or Misleading.............................................................20

    B.     Defendants Have No Proof Regarding Statements Allegedly Made by Shuffle Master in Gaming Today and WallSt.net....................................22

    C.     Shuffle Master's Website Does Not Claim That Shuffle Master Has a Patent on Four Card Poker. ...............................................23

VI.    DEFENDANTS CANNOT ESTABLISH INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE. ............................................24

    A.     Defendants Cannot Establish Prospective Contractual Relationships With Any Third Parties..............................................24

    B.     Defendants Cannot Establish That Shuffle Master Had Knowledge of Any of the Defendants' Alleged Prospective Relationships.......................26

    C.     Defendants Cannot Establish the Required Bad Faith Intent on the Part of Shuffle Master.................................................26

VII.   DEFENDANTS CANNOT PUT FORTH THE REQUISITE EVIDENCE TO SUPPORT THEIR CLAIM OF TRADE LIBEL. .......................................27

    A.     Defendants Have Offered No Evidence that Shuffle Master's Statements Were False or Made With Malice................................28

    B.     Defendants Cannot Show the Requisite Special Pecuniary Damages. ........................29

VIII.  CONCLUSION. ................................................................29

# TABLE OF AUTHORITIES

Page(s)

**CASES**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ................................................................................................ 5

Argus Chem. Corp. v. Fibre Glass-Evercoat Co.,
182 F.2d 1381 (Fed. Cir. 1987).......................................................................... 12

Atl. Richfield Co. v. USA Petroleum Co.,
495 U.S. 328 (1990) .............................................................................................. 7

Badger Meter v. Grinnell Corp.,
13 F.3d 1145 (7th Cir. 1994) ............................................................................. 16

Baxa Corp. v. McGaw, Inc.,
996 F. Supp. 1044 (D. Colo. 1997) .................................................................... 13

C.R. Bard, Inc. v. M3 Sys., Inc.,
157 F.3d 1340 (Fed. Cir. 1998)...................................................................11, 13

Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,
15 F.3d 1573 (Fed. Cir. 1993) ........................................................................... 17

Cataphote Corp. v. DeSoto Chem. Coatings, Inc.,
450 F.2d 769 (9th Cir. 1971) ............................................................................. 12

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) .............................................................................................. 5

Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,
173 F.3d 725 (9th Cir. 1999) ........................................................................21, 22

Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.,
911 F.2d 242 (9th Cir. 1990) ............................................................................. 21

DeVoto v. Pacific Fidelity Life Ins. Co.,
618 F.2d 1340 (9th Cir. 1980)........................................................................... 26

E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,
365 U.S. 127 (1961) ............................................................................................ 17

Eastman Kodak Co. v. Image Technical Servs.,
504 U.S. 451 (1992) ............................................................................................ 10

Eli Lilly & Co. v. Aradigm Corp.,
376 F.3d 1352 (Fed. Cir. 2004)......................................................................... 14

F.B. Leopold Co. v. Roberts Filter Mfg.,
882 F. Supp. 433 (W.D. Pa. 1995) ...................................................................... 9

GAF Building Materials Corp. v. Elk Corp. of Dallas,
90 F. 3d 479 (Fed. Cir. 1996)............................................................................... 2

**TABLE OF AUTHORITIES** *(Continued)*

<u>Page</u>

*Gee v. Pima County,*
    612 P.2d 1079 (Ariz. App. 1980) ...................................................................... 29

*Gen. Products Co. v. Meredith Corp.,*
    526 F. Supp. 546 (E.D. Va. 1981) .............................................................28, 29

*Glass Equip. Dev. Inc. v. Besten, Inc.,*
    174 F.3d 1337 (Fed. Cir. 1999) ...................................................................... 17

*Gleason Works v. Oerlikon Geartec, AG,*
    141 F. Supp. 2d 334 (W.D.N.Y. 2001) .......................................................... 25

*Great Escape, Inc. v. Union City Body Co., Inc.,*
    791 F.2d 532 (7th Cir. 1986) .......................................................................... 15

*J.J. Industries, LLC v. Bennett,*
    71 P.3d 1264 (Nev. 2003) ................................................................................ 26

*Marley Co. v. FE Petro, Inc.,*
    38 F. Supp. 2d 1070 (S.D. Iowa 1998) .....................................................20, 29

*Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) .......................................................................................... 5

*Mayflower Transit, LLC v. Prince,*
    314 F. Supp. 2d 362 (D.N.J. 2004) ................................................................ 29

*Nadel v. Play-by-Play Toys & Novelties, Inc.,*
    208 F.3d 368 (2d Cir. 2000) .......................................................................24, 25

*Nobelpharma AB v. Implant Innovations, Inc.,*
    141 F.3d 1059 (Fed. Cir. 1998) ...................................................................... 17

*OptInRealBig.com, LLC v. Ironport Sys., Inc.,*
    323 F. Supp. 2d 1037 (N.D. Cal. 2004) .....................................................27, 28

*Pacific Express, Inc. v. United Airlines, Inc.,*
    959 F.2d 814 (9th Cir. 1992) ............................................................................ 6

*Pacifica Kidney Ctr., Inc. v. Nat'l Med. Care, Inc.,*
    1993 WL 190858 (9th Cir. 1993) .................................................................... 11

*Shuffle Master, Inc. v. Gaming Entertainment, Inc.,*
    Case No. 3:03cv122 MA ................................................................................ 17

*Sicor Ltd. v. Cetus Corp.,*
    51 F.3d 848 (9th Cir. 1995) ........................................................................7, 11

*Spacone v. Microsoft Corp.,*
    2006 WL 648740 (N.D. Cal., March 10, 2006) .............................................. 5

**TABLE OF AUTHORITIES** *(Continued)*

<u>Page</u>

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993) ...................................................................... 6, 8, 10, 11, 15, 18

*T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,*
    809 F.2d 626 (9th Cir. 1987) ........................................................................ 5

*Tunis Bros. Co. v. Ford Motor Co.,*
    952 F.2d 715 (3d Cir. 1991) ......................................................................... 8

*United States v. E.I. duPont de Nemours & Co.,*
    351 U.S. 377 (1956) ........................................................................... 8, 10, 11

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,*
    375 F.3d 1341 (Fed. Cir. 2004) .................................................................... 9

*Waldemar Link v. Osteonics Corp.,*
    32 F.3d 556 (Fed. Cir. 1994) ...................................................................... 14

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
    382 U.S. 172 (1965) ............................................................................ 12, 17

*Wichinsky v. Mosa,*
    847 P. 2d 727 (1993) ................................................................................ 24

*Zenith Elecs. Corp. v. Exzec, Inc.,*
    182 F.3d 1340 (Fed. Cir. 1999) .................................................................. 19

**STATUTES**

15 U.S.C. § 1125(a) ........................................................................................ 18

15 U.S.C. § 2 .................................................................................................. 7

**RULES**

Fed. R. Civ. P. 56(e) ....................................................................................... 8

**OTHER AUTHORITIES**

ABA Section of Antitrust Law, *Antitrust Law Developments*, Vol. I (5th ed. 2002) ....................... 15

*Antitrust Counterclaims in Patent Infringement Cases:   A Guide to Walker Process and Sham-Litigation Claims,*
    10 Tex. Intell. Prop. L. J. 95 (2001) ............................................................ 12

Restatement (Second) of Torts, § 623A (1977) ...................................................... 27, 28

Restatement (Second) of Torts, § 626 (1977) ........................................................ 27, 28

# BACKGROUND

## I.   INTRODUCTION

Defendants have asserted four counterclaims against Shuffle Master, Inc. and its Chief Executive Officer, Mark Yoseloff (together, "Shuffle Master").   These counterclaims fall into two broad groups:  (1) alleged antitrust violations; and (2) alleged Shuffle Master statements and actions constituting unfair competition, intentional interference, and trade libel.   But, there is no evidence to support these allegations.   Furthermore, even accepting all of Defendants' allegations as true, Defendants fail as a matter of law to establish critical elements of their counterclaims.

Defendants' antitrust claims suffer from numerous defects, only the first of which is Defendants' inability to meet their burden of defining the relevant market.  Defendants have set forth only conflicting, unsubstantiated evidence as to the relevant market, and therefore cannot prove what the "market" is—a key element of Defendants' antitrust claim.   And, even if the Defendants' alleged market was the relevant market, the evidence of record shows that Shuffle Master would have no "monopoly power" in that market—another key element of Defendants' antitrust claim.   Moreover, none of Shuffle Master's alleged acts—such as obtaining and asserting U.S. Patent No. 6,698,759 ("the '759 Patent"), filing suit to protect its patent rights, or offering low prices and free gifts to customers—constitutes the required "predatory or anticompetitive behavior" necessary to sustain an antitrust action.   Instead, each of these acts is legally permissible, and Defendants lack the necessary evidence to establish otherwise.

Defendants also fail to establish their other unfair competition-based claims.  With respect to their unfair competition claim under the Lanham Act, Defendants cannot demonstrate that Shuffle Master's statements were false or misleading, a required element of Defendants' claim.   In fact, Defendants cannot even establish that several of the allegedly false statements were made at all. Defendants likewise cannot establish intentional interference with prospective business advantage because they cannot show that they had the requisite prospective contractual relationships with the small number of third parties set forth in their counterclaim, much less that Shuffle Master had any knowledge or intent to interfere with those relationships.  Finally, because Defendants cannot show

Shuffle Master's statements were false, made with malice and that Defendants suffered special pecuniary damages as a result of them, Defendants' common law trade libel claim fails as well.

Shuffle Master now moves this Court for summary judgment on all of Defendants' counterclaims, for the reasons summarized above and explained in more detail below.

## II.   FACTUAL BACKGROUND[1]

### A.   Defendants Factual Allegations Concern Antitrust Allegations and Claims Based on Allegedly False Statements.

As explained in Shuffle Master's Motion to Dismiss, (Docket No. 35) Defendants' counterclaims can be distilled into two main groups of contentions.

First, Defendants contend that Shuffle Master "seeks to monopolize the poker table game market and has attempted to effect such monopolization through the assertion of rights in the '759 Patent . . . ." (Docket No. 97, Second Am. Countercl. ¶ 18.)[2]  According to Defendants, Shuffle Master intentionally named the wrong inventors on the '759 Patent in an effort to get the benefit of an earlier filing date and thereby avoid prior art.  Defendants state that Shuffle Master has since attempted to enforce the '759 Patent with full knowledge that the '759 Patent is invalid.  (Docket No. 97, Second Am. Countercl. ¶¶ 8-9, 12.)  However, Shuffle Master's naming of Webb and Snow as co-inventors was considered, and still is considered, proper by Shuffle Master and, therefore, Defendants cannot demonstrate that Shuffle Master perpetrated a knowing fraud on the Patent

---

[1]   Shuffle Master relies primarily on the separate Statement of Undisputed Material Facts, filed herewith, and provides this brief statement of facts to provide the Court with the context of the arguments set forth below.

[2]   Defendants also alleged that Shuffle Master committed antitrust violations for enforcing U.S. Application Ser. No. 10/152,325 ("the '325 Patent Application").  However, because a patent application cannot be invalid, much less knowingly invalid, *GAF Building Materials Corp. v. Elk Corp. of Dallas*, 90 F. 3d 479, 482 (Fed. Cir. 1996), this Court dismissed Defendants' antitrust counterclaims to the extent they relied upon alleged '325 Patent Application enforcement efforts. (Docket No. 96, Order at 12.)

1   Office.[3]   Further, Defendants cannot establish the other elements of a Sherman Act claim — the

2   relevant market, or Shuffle Master's power in that market.

3          Second, Defendants claim that Shuffle Master has "defamed and disparaged" the Defendants

4   and their products by making false statements related to the Defendants' infringement of Shuffle

5   Master's intellectual property rights, and the results of the hearings in this case.  (Docket No. 97,

6   Second Am. Countercl. ¶¶ 13-14.)   As discussed below, Defendants fail to show that these

7   contentions can serve as the basis for any viable counterclaim.

8          **B.     Defendants Did Not Obtain Key Evidence, Nor Provide Timely Responses to
               Shuffle Master's Discovery.**

9
10         Defendants' conduct during discovery shows that they neither sought the information from

11  Shuffle Master or experts necessary to support their claims, nor provided information that would have

12  substantiated their allegations.

13         With respect to discovery sought by Defendants, it should be noted that Defendants did not

14  notice a single deposition of any Shuffle Master witnesses.  (Mowatt-Larssen Decl. ¶ 12.)[4]  Similarly,

15  while much of the discovery the Defendants propounded sought information about Shuffle Master's

16  claims of trade dress infringement, Defendants never inquired about Shuffle Master's bases for any of

17  the conduct or statements Defendants now complain of (Mowatt-Larssen Decl. ¶ 7), meaning that

18  Defendants are in no position to credibly dispute Shuffle Master's state of mind, a key issue in nearly

19  all of Defendants' counterclaims.

20         As for expert discovery, Defendants failed to notice the depositions of any of Shuffle Master's

21  experts (including Dr. Mohan Rao, who provided an analysis of relevant market and market power

22  associated the Defendants' antitrust allegations).  Defendants also did not designate any responsive

23  _____

24  [3]   After the close of discovery, in response to Shuffle Master's discovery requests, Defendants
    additionally asserted that various other perceived improper conduct supports their antitrust claims.

25  (Ex. F at 9, Answer to Interrog. No. 17)  As shown below, none of this belatedly asserted conduct
    supports Defendants' antitrust claims either.

26  [4]   The declarations of Tore Mowatt-Larssen ("Mowatt-Larrsen Decl."), Mark Yoseloff ("Yoseloff

27  Decl."), Mohan Rao ("Rao Decl."), Diana Campagna ("Campagna Decl.") and Gianni Cutri ("Cutri
    Decl.") are filed herewith.

28

experts or testimony nor provide any expert reports on any issue in this case, including antitrust, monopolistic behavior, inequitable conduct, invention of the '759 patent, the scope of Shuffle Master's patent or other intellectual property rights or damages.

Defendants' responses to Shuffle Master's discovery were lacking as well.  All of Defendants' substantive interrogatory responses setting forth evidence and contentions regarding their counterclaims were received by Shuffle Master after the close of discovery.  Shuffle Master served its second round of written discovery requests (*i.e.*, a Second Set of Interrogatories, Second Set of Requests for Production, and Requests for Admission) dedicated to Defendants' counterclaims on Defendants on July 28, 2006.  (Exs. A - C.)[5]  Defendants responded to Shuffle Master's written discovery on August 30, but failed entirely to respond to Shuffle Master's document requests.  In the responses that were initially served to Shuffle Master's Interrogatories and Requests for Admission, Defendants merely put forth unfounded objections to Shuffle Master's interrogatories and denied each and every one of Shuffle Master's Requests for Admission.  (Ex. D, Defendants' Answers to Shuffle Master's Second Set of Interrogatories; Ex. E, Defendants' Response to Shuffle Master's Requests for Admission.)   Defendants did not correct their responses to the Requests for Admission or respond in any fashion to the Requests for Production until October 18, 2006 (Ex. G, Defendants' Amended Response to Shuffle Master's Requests for Admission at 8; Ex. H, Defendants' Responses to Shuffle Master's Second Request for Production of Documents and Things at 12), over six weeks after the close of discovery in this matter, and only after multiple meet and confer attempts and communications to Defendants' counsel by Shuffle Master.[6] (Ex. I, Correspondence between Shuffle Master's counsel and Defendants' counsel.)   Defendants' counsel blamed their late responses on an administrative assistant who was supposed to prepare the materials for service, did not do so, and has since been fired.  (Campagna Decl., Ex. 1.)

_____

[5]    Unless otherwise indicated, all citations to "Ex." refer to the exhibits attached to the Declaration of Gianni Cutri filed herewith.

[6]    Amended Responses to Shuffle Master's Second Set of Interrogatories were served in early September, with verification provided on October 27, 2006.  (Ex. F.)

But even when the "amended" responses were provided, Defendants persisted in maintaining obviously unfounded objections. As but one example, when asked to identify "each separate false and disparaging statement, including the specific date (or dates) that each such statement was made, who made it, to whom it was made, what exactly was stated," Defendants asserted that the interrogatory was not relevant, that it invaded attorney-client and attorney-work product privileges, and that it sought confidential proprietary business information and trade secrets. (Ex. F, Answer to Interrog. No. 25.) In short, at every juncture, Defendants have refused to meaningfully participate in seeking or responding to discovery.

## III.     LEGAL STANDARD

Shuffle Master need not produce evidence to negate Defendants' claim, but instead the burden at summary judgment is satisfied "by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support Defendants' case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once Shuffle Master meets its burden, the burden shifts to the Defendants to demonstrate "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); *Spacone v. Microsoft Corp.*, 2006 WL 648740, *3-4 (N.D. Cal., March 10, 2006). However, Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, once Shuffle Master satisfies its burden, Defendants may not rely on denials in the pleadings, but instead must produce specific evidence, through affidavits or admissible discovery evidence, showing that a dispute as to a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for Defendants. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). And, even taking the facts in the light most favorable to Defendants, they must still be able to meet the substantive burden of proof applicable at trial to survive a motion for summary judgment. *Anderson*, 477 U.S. at 244-47.

**ARGUMENT**

**IV.    DEFENDANTS CANNOT ESTABLISH THAT SHUFFLE MASTER VIOLATED ANY ANTITRUST LAW**

    **A.    Defendants' Allegations Fail to Satisfy Their Burden of Proof Regarding Their Antitrust Claims.**

        To prove that Shuffle Master attempted to monopolize under Section 2 of the Sherman Act, Defendants must show that Shuffle Master:

    (1)    had a specific intent to control prices or destroy competition;

    (2)    engaged in predatory or anticompetitive conduct to accomplish the monopolization;

    (3)    had a dangerous probability of success in monopolizing the market; and

    (4)    caused an antitrust injury.

*Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir. 1992).   Typically, an antitrust analysis begins with an examination of the third element of a Section 2 claim, the plaintiff (or counterclaimant here) must show "a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993).   Therefore, below, Shuffle Master first demonstrates that the Defendants cannot carry their burden of proving what the relevant product market is, or that Shuffle Master has "monopoly power" in the relevant market.   No analysis of the allegedly "anticompetitive conduct" is necessary because Defendants cannot clear the hurdle of establishing the relevant product market or monopoly power.   However, in the interest of completeness, Shuffle Master also demonstrates that Defendants cannot establish that Shuffle Master engaged in any anticompetitive conduct prohibited under the Sherman Act.

        Defendants' Second Amended Counterclaim laid out Defendants' original contentions regarding Shuffle Master's allegedly anticompetitive conduct in violation of Section 2 of the Sherman

Antitrust Act, 15 U.S.C. § 2.[7]  There, Defendants claimed that Shuffle Master named two individuals, Messrs. Snow and Webb, as inventors of the '759 Patent, allegedly with knowledge that neither were the actual inventors or co-inventors, and did so to obtain an earlier filing date for the '759 Patent. (Docket No. 97, Second Am. Countercl. ¶ 9.)  Defendants claimed that Shuffle Master then asserted the '759 Patent against GEI and other competitors, including by way of a lawsuit filed in the Northern District of Mississippi (since dismissed), and a parallel action in the District of Nevada, which is ongoing.  (*Id.* at ¶ 11(1)-(5).)

However, when asked to state "the complete legal and factual bases for" their Third Claim for Relief in discovery, these allegations regarding the '759 patent were noticeably absent. Instead, Defendants set out three new bases for their antitrust claims, including

> [1] Shuffle Master's telling customers that if they remove GEI games they will receive free products, or that they can undercut any price offered by GEI. [2] Shuffle Master regularly copies games and other gaming products then sues the smaller gaming company such as GEI to settle or damage them into submission.  [3] Shuffle Master also sent the letters cited herein claiming that they hold the intellectual property rights which they do not prevents/intimidates customers from dealing with their competitors.

(Ex. F at 9, Answer to Interrog. No. 17.) Defendants did not mention (much less offer any proof of) the allegedly misnamed inventors of the '759 patent and the specific lawsuits involving that patent. And, because the naked allegations in the Counterclaim are not admissible evidence, Defendants cannot withstand summary judgment on their original Counterclaim contentions regarding the '759 patent.  *See Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 853 (9th Cir. 1995) (stating that "the nonmoving party must go beyond the pleadings and identify facts showing the existence of a genuine issue for

---

[7]   Defendants also point to Section 4 of the Clayton Act.  However, Section 4 of the Clayton Act provides for a private right of action for substantive violations of antitrust laws, but provides no separate cause of action.  *See, e.g., Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 331 n. 1 (1990).

trial" and affirming grant of summary judgment on Section 2 Sherman Act claim); *see also* Fed. R. Civ. P. 56(e).

**B.    Defendants Cannot Prove What the Relevant Market Is, and Shuffle Master Has No Market Power in Any Relevant Market.**

Defendants simply cannot show that Shuffle Master has any probability of monopolization because they cannot prove what the relevant market is, or Shuffle Master's market power therein.

**1.    No Reasonable Jury Could Conclude That the Relevant Market is "Novelty Games," "Novelty Poker Variation Games," "Poker Table Games" or Any of the Other Market Definitions Put Forth by Defendants.**

For purposes of a showing of "probability of monopolization," Defendants have the burden of establishing the "relevant market." *Spectrum Sports*, 506 U.S. at 455.  The relevant market has at least two components, including the relevant geographic and product markets.  *Id.* at 459.[8]  The relevant product market is defined as "those commodities reasonably interchangeable by consumers for the same purposes." *Tunis Bros. Co. Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991) (quoting *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

Defendants have proffered a number of different, unsubstantiated definitions of the allegedly relevant product market.  First, in their Second Amended Counterclaim, Defendants defined the market as "poker table games."  (Docket No. 97, Second Am. Countercl. ¶¶ 17-18.)  Then, in response to an interrogatory that specifically sought the definition of the relevant product market, Defendants asserted that the market and product market was "[a]ny novelty game" and "[t]he national gaming industry."  (Ex. F at 10, Answer to Interrog. No. 18.)  Later, in answer to another

---

[8]    The relevant geographic market is defined as the "area in which a potential buyer may rationally look for the goods or services he or she seeks." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991) (citation omitted).  Defendants have not proffered any evidence that it is smaller than the United States.  (*See* Rao Decl., Ex. A at ¶ 22.)  In fact, Defendants were explicitly asked for their contention as to relevant geographic market, but provided no response.  (Ex. F at 9-10, Answer to Interrog. No. 19.)  On this basis alone, the Court should dismiss the antitrust counterclaim, because Defendants cannot meet their burden of defining and proving the geographic market. *Spectrum Sports*, 506 U.S. at 459.

1  interrogatory, Defendants discuss "novelty poker variation games," apparently asserting that "novelty

2  poker variation games" is the relevant market.  (Ex. F, Answer to Interrog. No. 19.)

3         Given Defendants' differing allegations as to the relevant market, Shuffle Master deposed Mr.

4  Awada in his individual capacity and as a 30(b)(6) witness for Gaming Entertainment, Inc. and sought

5  to clarify Defendants' position on the relevant market.  (Ex. J, Awada Dep. at 260:1-5.)  In that

6  deposition, Defendants took the position that the relevant product market was all "table games."

7  (Ex. J, Awada Dep. at 260:1-5.)  Thus, Defendants offered yet another, different allegation of the

8  relevant market.

9         Defendants have offered no expert testimony which would clarify this conflicting evidence.

10  (Mowatt-Larssen Decl. ¶ 15.)  Further, Defendants have produced no documents that would reflect

11  upon the proper definition of the relevant market.  (*Id.*)  Finally, Defendants have identified no

12  witnesses in their Initial Disclosures as having knowledge as to the relevant product market.  (Ex. K,

13  Defs. Initial Disclosures.)  Thus, Defendants proffer only unsubstantiated and varying assertions as to

14  the relevant product market.   Such conflicting, unsubstantiated evidence, devoid of analysis or

15  support, is insufficient to meet their burden in establishing the relevant product market.  *See Unitherm*

16  *Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1363 (Fed. Cir. 2004) (vacating verdict in favor

17  of claimant, because claimant failed to present any facts that could allow a reasonable jury to accept

18  its proposed market definition and emphasizing that market definition "hinges on economic

19  evidence"); *see also F.B. Leopold Co, Inc. v. Roberts Filter Mfg.*, 882 F. Supp. 433, 450-51 (W.D.

20  Pa. 1995) (antitrust claimant's numerous proposed market definitions without evidence nor an

21  analysis were insufficient to establish a relevant product market).  Thus, Defendants' antitrust claim

22  should be denied on this basis alone.

23         However, the argument for granting summary judgment in Shuffle Master's favor is made all

24  the more persuasive by the existence of evidence establishing that Defendants' numerous proposed

25  product market definitions are incorrect.  Shuffle Master's expert, Mr. Mohan Rao, has concluded

26  that, from the standpoint of casino operations, the relevant market for Shuffle Master's Three Card

27  and Four Card Poker games is one that includes table games and slot machines, all of which compete

28

for casino floor space.  (*See* Rao Decl., Ex. A at ¶ 17 (citing 2003 article entitled "The Demand for Casino Gaming" in *Applied Economics*).)  All casino games, including table games and slot machines make up the market, because they are competing products for similar uses.  *duPont*, 351 U.S. at 380-81 ("[i]nterchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics, and adaptability of the competing commodities"); (*See* Rao Decl., Ex. A at ¶ 17.)  In fact, in his deposition, Mr. Awada himself agreed, stating that "all games compete against each other for floor space."  (Ex. J, Awada Dep. at 258:11-260:5.)

Because Defendants have failed to satisfy their burden with respect to defining and proving their proposed relevant market, this Court should grant summary judgment.

<strong>a.      Even if Defendants Can Establish the Relevant Market, Defendants Have Produced No Evidence of Shuffle Master's Market Power.</strong>

To demonstrate a probability of monopolization, Defendants must also show that Shuffle Master has market power within the relevant market.  *Spectrum Sports*, 506 U.S. at 455.  "Market power is the power to force a purchaser to do something that he would not do in a competitive market.  It has been defined as the ability of a single seller to raise price and restrict output." *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 464 (1992) (citations omitted).

Shuffle Master's expert has concluded that Shuffle Master has 3% of the market of casino games, which is insufficient for Shuffle Master to have the power to "influence prices or exclude others from competing in this market."  (Rao Decl., Ex. A at ¶ 26.)  Shuffle Master's expert also noted that, even if the relevant market was defined as table games, "Shuffle Master would have a market share of only 20 percent which still is insufficient to exert market power."  (*Id.* at ¶ 27.) Defendants have proffered no contrary evidence that Shuffle Master has market power in casino or table games.[9]

---

[9]      At one point, Defendants allege a market share with respect to "novelty poker variation games" of at least 80-90%.  (Ex. F at 10-11, Answer to Interrog. No. 19.)  But, as discussed above, no reasonable jury could conclude that the relevant market is "novelty poker variation games," because, as discussed above, Mr. Awada himself admitted that novelty poker variation games would compete with all other games for floor space.  (Ex. J, at 259:3-10.)  Thus, these combined, interchangeable products make up the relevant market, which must, by definition be broader than "novelty poker

*(Footnote Continued . . .)*

Proof of market power is essential to a showing of a dangerous probability of monopolization. *Spectrum Sports*, 506 U.S. at 455, *see also Pacifica Kidney Ctr, Inc. v. Nat'l Med. Care, Inc.*, 1993 WL 190858, *3 (9th Cir. 1993) (unpublished).    No reasonable jury could conclude, and Defendants have failed to demonstrate, that Shuffle Master has market power in any pertinent market.    Thus, for this additional reason the Court should grant summary judgment dismissing Defendants' antitrust counterclaim.

### 2.    Shuffle Master Did Not Commit Knowing and Willful Fraud in Obtaining the '759 Patent.

Defendants' inability to establish the relevant market and Shuffle Master's lack of market power in any relevant market is sufficient for this Court to dismiss the antitrust counterclaim, regardless of whether Shuffle Master engaged in "anticompetive conduct."    Nevertheless, Shuffle Master demonstrates below that Defendants cannot establish that Shuffle Master engaged in any anticompetitive conduct prohibited under the antitrust laws.    As discussed above, Defendants identified Shuffle Master's assertion of its '759 Patent rights against competitors and customers in its Second Amended Counterclaim as the basis for its antitrust claim.    (*e.g.*, Docket No. 97, Second Am. Countercl. ¶ 12.)    However, Defendants never offered any evidence supporting these allegations, including the claims of the '759 Patent that were allegedly asserted, the competitors against whom they were asserted, and the cases or threats that were actually carried out. (Mowatt-Larssen Decl. ¶ 17.)    Without such evidence, their claims must fail.    *See Sicor*, 51 F.3d at 853.    However, even assuming Defendants could prove these elemental facts underlying their claims, they would not be able to meet the rigorous standard of proof to go forward on their counterclaim.

The Supreme Court has found liability specific to patentees under Section 2 of the Sherman Act if a "patent has been procured by knowing and willful fraud … and [the patentee] has used its fraudulently obtained patent to [attempt to] restrain competition." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1367 (Fed. Cir. 1998) (citing *Walker Process Equip., Inc. v. Food Mach. & Chem.*

---

*(. . . Continued Footnote)*

variation games." *duPont*, 351 U.S. at 395 (holding that relevant product market is defined as those commodities reasonably interchangeable by consumers for the same purposes).

*Corp.*, 382 U.S. 172, 174 (1965)).  The fraud that "Walker Process claimants" must prove to support their claim is "extremely circumscribed."[10]  *Cataphote Corp. v. DeSoto Chem. Coatings, Inc.*, 450 F.2d 769, 772 (9th Cir. 1971).  Specifically, Walker Process claimants must show deliberate fraud on the part of the patentee:

> Wholly inadvertent errors or honest mistakes which are caused by neither fraudulent intent or design, nor by the patentee's gross negligence, do not constitute fraud under *Walker*. . . .  **The road to the Patent Office is so tortuous and patent litigation is usually so complex, that "knowing and willful fraud" as the term is used in *Walker*, can mean no less than <u>clear, convincing proof of intentional fraud involving affirmative dishonesty, "a deliberately planned and carefully executed scheme to defraud . . . the Patent Office."</u>**

*Id.* (quotations and citations omitted) (emphasis added).  The Federal Circuit has explained that a mere showing of "inequitable conduct," which can be sufficient to invalidate a patent, is insufficient to show knowing and willful fraud as required to prove a violation of Section 2 of the Sherman Act. *Argus Chem. Corp. v. Fibre Glass-Evercoat Co.*, 812 F.2d 1381, 1384-85 (Fed. Cir. 1987).

Defendants do not even begin to make the requisite showing that Shuffle Master obtained the '759 Patent through intentional fraud involving affirmative dishonesty, or a deliberately planned and carefully executed scheme to defraud the Patent Office.  Defendants' assert in support of their Walker Process claim that Shuffle Master wrongly claimed Webb was a co-inventor of the inventions claimed in the '759 Patent application in an effort to gain priority back to a string of earlier patents filed by Webb.  (Docket No. 97, Second Am. Countercl. ¶ 9.)  Defendants also assert that Shuffle Master wrongly claimed Snow was a co-inventor.  However, Webb did invent the subject matter claimed in the '759 Patent.

The background of Defendants' argument as to inventorship is as follows.  Derek Webb sold his rights in an application for a game called Three Card Poker, together with any patents and patent

---

[10]   Indeed, in *Antitrust Counterclaims in Patent Infringement Cases:  A Guide to Walker Process and Sham-Litigation Claims*, 10 Tex. Intell. Prop. L. J. 95, 99 & n. 22 (2001), a survey found that, between 1985 and 1993, only eight percent of cases in which Walker Process claims were finally adjudicated were successful.  From 1993 to 2001, only one case found liability for a *Walker Process* claim, and only one published case survived a motion for summary judgment.

1   applications derived therefrom, to Shuffle Master on May 10, 1999. (Ex. L, Farrar Decl. ¶¶ 3-4.)

2   Pursuant to that agreement, Shuffle Master has the right to pursue patent rights for any inventions

3   contained in or based on the original application. (*Id.*) Shuffle Master did so, and submitted an

4   application for an invention that eventually issued as the '759 patent, which named Webb and Snow

5   as inventors. The Patent office specifically considered whether the '759 claims were supported by the

6   original Webb-only patents from which the '759 Patent claims priority. *See* Ex. M at SM-A5172-75

7   (Office Action response arguing and demonstrating that the claims of the '759 patent were fully

8   supporting by the original webb-only patent application from which it claims priority). The Patent

9   Office considered this argument and conclusively found that the '759 patent claims were supported by

10  Webb's original application. (Ex. M at SM-A5179 (finding that the claims were allowable, and

11  stating that "the present application [of the '759 patent] claims priority from [Webb's original

12  application], which has a priority US filing date of 7/19/95.").) Derek Webb was therefore a properly

13  named inventor of the '759.

14       Shuffle Master believed and still believes that Webb was a proper inventor of the '759 Patent.

15  (Ex. L, Farrar Decl. ¶¶ 6-7.) The Patent Office's consideration of the priority issue and determination

16  that the claims of the '759 Patent were supported by the original Webb-only patent from which the

17  '759 Patent claims priority is conclusive evidence that Shuffle Master's belief was reasonable.

18  Defendants have no evidence whatsoever as to Shuffle Master's state of mind on this issue—they did

19  not even bother to depose a single Shuffle Master employee. (Mowatt-Larssen Decl. ¶ 12.) In short,

20  Defendants have absolutely no basis for their assertion that Shuffle Master committed an intentional

21  fraud involving affirmative dishonesty or a deliberately planned and carefully executed scheme to

22  defraud the PTO. Defendants' *Walker Process* claim on this basis therefore fails as a matter of law.

23  *See C.R. Bard*, 157 F. 3d at 1365 (reversing judgment in favor of party asserting *Walker Process*

24  claim and finding no evidence of intent to deceive the PTO in naming certain inventors in patent

25  application); *Baxa Corp. v. McGaw, Inc.*, 996 F. Supp. 1044, 1052-53 (D. Colo. 1997) (granting

26  summary judgment dismissing Walker Process claim and finding evidence insufficient for a reasonable

27  juror to find by clear and convincing evidence that patentee misrepresented inventor to PTO).

28

Additionally, there is no evidence that Shuffle Master committed knowing fraud on the Patent Office by naming Webb and Snow as co-inventors of the '759 patent application. Indeed, the only evidence of record demonstrates that Shuffle Master believed and still believes that naming Webb and Snow as co-inventors was the proper procedure. (Ex. L, Farrar Decl. ¶ 7.) The '759 patent application was filed as a continuation-in-part (or "CIP") of the Webb-only patents. (Ex. M at SM-A5172-75.) A CIP patent application is an application that adds to subject matter disclosed in an earlier patent application. *Waldemar Link v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994). Snow, building upon concepts obtained from Webb when Shuffle Master acquired three Card Poker and its related applications, conceived of improvements to the game purchased from Webb. (Ex. N, Snow Decl. ¶ 5; Ex. L, Farrar Decl. ¶ 6.) These concepts, in addition to the original concepts invented only by Webb, were disclosed in the '759 patent application, as the Patent Office found. (*Id.*; Ex. M, SM-A5179.) The law states that joint inventorship is established through precisely this type of behavior, such as "one inventor seeing a relevant report and building upon it . . . ." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004). Thus, Shuffle Master believed and still believes that Snow and Webb were properly identified as co-inventors. (Ex. L, Farrar Decl. ¶¶ 6-7.) More important for purposes of this motion, however, is that Defendants have no evidence to establish that Shuffle Master believed that Snow and Webb were not co-inventors. Because they have failed to satisfy their burden to do so, the Court should grant summary judgment in favor of Shuffle Master on Count I of Defendants' Counterclaim.

### 3.    Shuffle Master Did Not Engage in Other Improper Anticompetitive Activity.

In addition to the unsupported claims involving the '759 Patent, Defendants belatedly asserted additional actions by Shuffle Master as allegedly supporting their antitrust claim. Specifically, Defendants responded to Shuffle Master's Interrogatory No. 17 seeking the "complete legal and factual basis" for Defendants' antitrust claim by asserting that the following alleged actions support their claim:

- "Shuffle Master's telling customers that if they remove GEI games they will receive free products, or that they can undercut any price offered by Shuffle Master;"

- "Shuffle Master regularly copies games and other gaming products then sues the smaller gaming company such as GEI to settle or damage them into submission;"

- "Shuffle Master also sent the letters cited herein [letters from Yoseloff and Webb to certain casino customers regarding Defendants' Play Four Poker game] claiming that they hold the intellectual property rights which they do not prevents/intimidates customers from dealing with competitors."

(Ex. F, Answer to Interrog. No. 17.)  None of these asserted acts are predatory or anticompetitive as required under the Sherman Act.

a.      **Shuffle Master's Alleged Offers to Customers, Even if True, are Not Anticompetitive Acts.**

Defendants' allegation that Shuffle Master attempts to entice customers into buying Shuffle Master products by offering free products, and undercutting competitors' prices, does not support a Section 2 claim.[11]  No reasonable jury could conclude that this conduct, even if true, is anticompetitive within the meaning of Section 2 of the Sherman Act.  "The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."  *Spectrum Sports*, 506 U.S. at 458.  To be "predatory," conduct must be "economically irrational for the monopolist but for the conduct's adverse impact on competition." ABA Section of Antitrust Law, *Antitrust Law Developments*, Vol. I, at p. 247 (5th ed. 2002); *see also Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 541 (7th Cir. 1986) (granting summary judgment for failure to show "*irrational* economic behavior," and noting that, to be anticompetitive, conduct must have "no legitimate business justification other than to destroy or damage competition") (emphasis added).  It is rational competition to offer lower prices than competitors and free gifts with purchase.  *See Great Escape*, 791 F. 2d at 541.  Such acts cannot be called "irrational economic behavior" or be considered to have "no legitimate business justification." *See id.*  Thus, Defendants cannot establish these acts are predatory or anticompetitive under the Sherman Act.

---

[11]   In his deposition, Mr. Awada admitted that he could not state what products were offered for free, when they were offered, nor for how long. (Ex. J, Awada Dep. at 252:9-255:1.)  Likewise, Defendants have not produced any objective evidence of Shuffle Master's alleged discounted pricing.

-15-

1

2

3

      **b.**     **Without Evidence That Shuffle Master Filed Objectively and Subjectively Baseless Lawsuits, Defendants Allegations That Shuffle Master Copied Other Company's Games Then Threatened or Filed Lawsuits Do Not Support a Section 2 Claim.**

4

      Defendants allege that Shuffle Master copies games[12] and then sues or threatens to sue

5

Defendants and other competitors to "settle or damage them into submission." (Ex. F at 9, Answer

6

to Interrog. No. 17; *see also* Docket No. 97, Second Am. Countercl. ¶¶ 11(1) & 11(7).) Defendants'

7

failure to offer any proof that such lawsuits were objectively or subjectively baseless means that none

8

of these allegations are cognizable under Section 2 of the Sherman Act.[13]

9

      The Federal Circuit has held that

10

11

12

13

    [a] patent owner who brings a lawsuit to enforce the statutory right to exclude others from making, using or selling the claimed invention is exempt from the antitrust laws, even though such a suit may have an anticompetitive effect, unless the infringement defendant "proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247

14

15

16

17

18

19

20

21

22

23

24

25

26

---

[12]  Defendants do not identify what games Shuffle Master has allegedly copied. To the extent that Defendants' allegation here is based upon an assertion that Shuffle Master allegedly copied Mr. Awada's Three Way Action game, then it must fail. Awada filed a lawsuit in Nevada state court asserting various claims against Shuffle Master based upon Shuffle Master's introduction of a game called Triple Shot, allegedly a copy of Awada's Three Way Action game. (Ex. O, Complaint at ¶¶ 32-33). Shuffle Master and Awada had entered into an agreement under which Shuffle Master obtained an option to purchase Three Way Action games and all variations thereof. (Ex. P, Findings of Fact and Conclusions of Law ¶ 6.). The Nevada state court found, despite Shuffle Master's efforts to exercise that option (*id.* at ¶ 15), Defendants reneged on their agreement to transfer Three Way Action and variations thereof to Shuffle Master. (*Id.* at ¶ 24.) Based upon the Nevada state court's finding that Shuffle Master established "by clear and convincing evidence that [Defendants] fraudulently induced Shuffle Master into executing the Game Option Agreement" (*id.* at ¶ 21) and "by a preponderance of the evidence that [Defendants] materially failed to perform their obligations under the contract," (*id.* at ¶ 36) the Game Option Agreement was rescinded. (*Id.* at ¶ 37.) All of Defendants claims based upon Shuffle Master's introduction of Triple Shot were dismissed with prejudice. (Ex. Q, Order.) The record is devoid of any indication as to what other instances of alleged copying Defendants may be referring to. However, the law is clear that absent intellectual property protecting a game, the public is free to imitate it. *Badger Meter v. Grinnell Corp.*, 13 F.3d 1145 (7th Cir. 1994) ("[c]ompetitors are generally privileged to copy one another's products, ... because consumers benefit from the option to buy a copy that has 'some added premium (*e.g.*, faster delivery, cheaper pricing)' provided by the competitor").

27

[13]  Other than the Mississippi action, discussed below, Defendants have not even identified the allegedly baseless lawsuits.

28

1
2
3

(1965), or (2) that the infringement suit was a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor, *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)."

4

*Glass Equip. Dev. Inc. v. Besten, Inc.*, 174 F.3d 1337, 1343-44 (Fed. Cir. 1999) (quoting

5

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998)).  Defendants

6
7

have the burden to show that any lawsuit brought by Shuffle Master was both objectively and

subjectively baseless.  *Nobelpharma*, 141 F.3d at 1072.  A lawsuit is objectively baseless if "no

8
9

reasonable litigant could realistically expect success on the merits."  *Carroll Touch, Inc. v. Electro*

10

*Mech. Sys., Inc.*, 15 F.3d 1573, 1582 (Fed. Cir. 1993).  "If an objective litigant could conclude that

11

the suit is reasonably calculated to elicit a favorable outcome, . . . an antitrust claim premised on the

12

sham exception must fail."  *Id.*  Even if a lawsuit or the threat of a lawsuit is objectively baseless, the

13

claimant must still show that the threat of or actual lawsuit was subjectively baseless.  *Id.*

14
15

However, Defendants fail to show that any of Shuffle Master's lawsuits and alleged threat of

lawsuits were objectively, much less subjectively, baseless. When Defendants were asked to set forth

16

the complete bases for their antitrust counterclaims, the only response remotely related to any lawsuit

17

was that "Shuffle Master regularly copies games and other gaming products then sues the smaller

18
19

gaming company such as GEI to settle or damage them into submission."  (Ex. F at 9, Answer to

Interrog. No. 17.)  But, this vague claim cannot substitute for actual evidence of Shuffle Master's

20
21

state of mind, about which Defendants never inquired.   Indeed, Defendants did not ask *any*

interrogatories specific to their antitrust counterclaims.  (Mowatt-Larssen Decl. ¶ 7.)

22
23

Defendants also allege that Shuffle Master filed an action in the United States District Court

for the Northern District of Mississippi, *Shuffle Master, Inc. v. Gaming Entertainment, Inc.*, Case

24
25

No. 3:03cv122 MA, asserting that Defendants infringe Shuffle Master's '759 Patent, "in the hope of

causing [Defendants] to cease business."  (Docket No. 97, Second Am. Countercl. ¶ 11(2).)  But the

26
27

record evidence, discussed below, establishes that the Mississippi lawsuit was objectively and

subjectively reasonable.

28

Although the Counterclaim asserts that the Mississippi action was an attempt at "forum shopping as there was no basis for jurisdiction," Mr. Awada himself testified in this action that he regularly conducted business in Mississippi.  (Ex. J, Awada Dep. at 119:20-121:14.)  The same was true for the product at issue in the Mississippi Action (3-5-7 Poker).  (Yoseloff Decl. ¶ 4 (discussing similar testimony by other Shuffle Master employee).)   As for the substance of the allegations, although the Mississippi Action was transferred (with both parties to bear their costs and fees) (Ex. R, Transfer Order), the same allegations of patent infringement underlying the Mississippi action continue to be litigated in the Nevada '759 case, (Ex. S, Am. Compl.).  In that case, Defendants have been unable to establish that those claims were brought in bad faith or otherwise were objectively unreasonable.    Thus, the continued proceedings, combined with Shuffle Master belief that the Mississippi litigation was brought in good faith, demonstrates that that action was not objectively or subjectively baseless.

> c.    **Shuffle Master's Letters to Customers, Which Provided Truthful Information, Cannot Serve as a Basis for an Antitrust Action.**

As for the letters that Defendants claim were sent to competitors, as explained more fully below, those letters contained only true statements regarding Shuffle Master, its products and its intellectual property rights.  Therefore, providing such truthful statements cannot form the basis for "anticompetitive or predatory" behavior under antitrust laws.  *See Spectrum Sports*, 506 U.S. at 458. For all of these reasons, Defendants' antitrust counterclaim fails.  Accordingly, the Court should grant summary judgment in Shuffle Master's favor on Defendants' antitrust claims.

## V.    DEFENDANTS HAVE FAILED TO ESTABLISH THE NECESSARY ELEMENTS OF UNFAIR COMPETITION UNDER THE LANHAM ACT.

Defendants' unfair competition claim is similarly meritless.   Defendants claim that Shuffle Master engaged in unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), relying on allegedly false statements concerning Defendants' products and Shuffle Master's intellectual property rights.  (Docket No. 97, Second Am. Countercl. ¶¶ 20-24.)  This portion of the Lanham Act provides the basis for what are generally known as "false advertising," and "product disparagement" claims, the *sine qua non* of which is a false or misleading statement of fact.  *Zenith Elecs. Corp. v. Exzec,*

*Inc.*, 182 F.3d 1340, 1347-48 (Fed. Cir. 1999) (citing cases from various Circuits that hold that the plaintiff must prove that the defendant made a false or misleading statement of fact). However, as explained below, with respect to the statements made in correspondence by Shuffle Master, Defendants have not demonstrated that any of these were false or misleading factual statements. As for the other statements, allegedly made by Shuffle Master on websites and in news articles, Defendants cannot even show that such statements were made at all. For these reasons, this Court should grant summary judgment dismissing Defendants' Lanham Act unfair competition claim.

In their complaint, Defendants asserted that Shuffle Master made false and misleading representations regarding its rights in the '759 Patent and '325 Patent application, the infringing nature of Defendants' Play Four Poker and 3-5-7 Poker games, and the results of the present litigation. (Docket No. 97, Second Am. Countercl. ¶¶ 14 & 21.) However, when asked to "identify specifically each separate false and misleading statement or representation that Defendants claim Shuffle Master" made, (Ex. B, Interrogatory No. 24), Defendants identified only three separate categories of statements. As explained below, none of these statements is false.

First, Awada pointed to "the correspondence by Mark Yoseloff and Roger Snow" that was allegedly "published to 'all' gaming executives in the market." (Ex. F at 14, Answer to Interrog. No. 24.) With respect to such correspondence, Mr. Awada testified at his deposition that only certain portions of the following excerpt, made by Mr. Yoseloff, Chief Executive Officer of Shuffle Master, about this litigation were false:

> Shuffle Master has enjoyed an excellent and productive relationship with its customers for many years. . . .
>
> At the recent Global Gaming Expo, we found that a small gaming supplier, Gaming Entertainment, Inc. (GEI), had misappropriated our intellectual property, by out-and-out copying our highly successful Four Card Poker with their Play Four Poker. This past Monday we brought an action in Federal Court against this company and, on Wednesday, were granted a TRO to stop this conduct. Undaunted, this company continues to offer the product with the clear intention of interfering with our business with our casino customers.

(Ex. T, Sep. 22, 2005, Letter of Mark Yoseloff.) Specifically, Mr. Awada stated that the following statements were false and/or misleading: (1) "Shuffle Master has enjoyed an excellent and productive

relationship with its customers for many years" (Ex. J, Awada Dep. at 187-88); (2) that Defendants had "misappropriated [Shuffle Master's] intellectual property"[14] (*id.* at 186); and (3) that "this company [*i.e.*, Mr. Awada's company, GEI] continues to offer the product with the clear intention of interfering with our business." (*Id.* at 205.)[15]

Second, in response to Interrogatory No. 24, Defendants also pointed to statements allegedly made by Shuffle Master to "Gaming Today (exact date unknown) and WallSt.net (exact date unknown)" that Shuffle Master had a patent on four-card poker. (Ex. F at 14, Answer to Interrog. No. 24.) However, as explained below, Defendants never produced any documents supporting these alleged statements, (Mowatt-Larssen Decl. ¶ 13.), failing at the most basic level to support their claims.

Third, Defendants pointed to an alleged statement on Shuffle Master's website that allegedly "falsely claims that [Shuffle Master has] a patent on four card poker." (Ex. F at 14, Answer to Interrog. No. 24.) Here, Defendants misrepresent the website — Shuffle Master never stated that it has patent protection for Four Card Poker.

### A. The Statements in Shuffle Master's Correspondence Were Not False or Misleading.

To show that a statement was false, the counterclaimant "must show that the [counterclaim] defendant's statements relating to products are either literally false or are misleading and have a tendency to deceive customers." *Marley Co. v. FE Petro, Inc.*, 38 F. Supp. 2d 1070, 1086 (S.D. Iowa 1998). Defendants cannot establish that the statements in Shuffle Master's correspondence were false or misleading.

---

[14]   Similarly, Defendants assert that Shuffle Master's statement, made in a separate letter, that Defendants' Play Four Poker game was a "carbon copy of [Shuffle Master's] Four Card Poker Game" was misleading and false. (Ex. J, Awada Dep. at 207:13-19)

[15]   Mr. Awada also originally claimed that Shuffle Master's statement that "Four Card Poker has 225 installs in North America, making it one of the most popular specialty table games in history" was misleading and false. (Ex. J, Awada Dep. at 207:23-208:1.) However, he later admitted that he had "no idea" whether the statement was true or not, (*id.* at 208:12-14) and retracted the assertion. (*Id.* at 209:9-16.)

First, Shuffle Master's claim that it has "enjoyed an excellent and productive relationship with its customers for many years" is true. (Yoseloff Decl. ¶ 7.)  Even Mr. Awada himself was forced to admit the truth of this statement at his deposition.  (Ex. J, Awada Dep. at 188:16-19.)  More importantly, this statement is simply not actionable under the Lanham Act, as it is a "vague and subjective" statement of Shuffle Master's belief about its own reputation.  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999).  Like the statement in *Coastal Abstract Service* that a competitor was "too small" to handle a customer's business, Shuffle Master's statement regarding its relationship with customers over the course of many years "[is] not a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.  As a matter of law, it could not give rise to liability under . . . the Lanham Act . . . ."  *Id.*; *see also Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) (explaining that puffery, which a court may determine as a matter of law, is not actionable under Lanham Act).

Next, Defendants take issue with Shuffle Master's statements that Defendants' Play Four Poker copied Shuffle Master's Four Card Poker game, and "misappropriated [Shuffle Master's] intellectual property."  But, the evidence and proceedings thus far establish that GEI did, in fact, copy and misappropriate Shuffle Master's Four Card Poker game.  As explained in the Memorandum of Points and Authorities in Support of Shuffle Master's Motion for Preliminary Injunction, Defendants' trade dress and game were virtually identical to Shuffle Master's, down to duplicated printer's errors on both games.  (Docket No. 42, Memorandum of Points and Authorities in Support of Shuffle Master's Motion for Preliminary Injunction at 18-19.)  Mr. Awada himself also admitted much of the copying at his deposition.  (Ex. J, Awada Dep. at 133-145.)  And, perhaps most importantly, this Court *entered an order for a preliminary injunction* to stop the Defendants' admitted misappropriation of Shuffle Master's intellectual property wherein the Court found that "Defendants' trade dress is virtually identical to Shuffle Master's."  (Docket No. 94, Order at 8.)  As the following exchange demonstrates, Mr. Awada himself succinctly understands that Defendants' unfair competition claim cannot stand in light of the Court's order:

Q:  But you did misappropriate Shuffle Master's intellectual property in its trade dress,

did you not?

Mr. Ramirez:  Objection.  Calls for a legal conclusion.

MR. AWADA:  If the judge said so, then we did.

(Ex. J, Awada Dep. at 191:21-192:2.)

Finally, Defendants argue that Shuffle Master's claim that GEI "continues to offer the [Play Four Poker] product with the clear intention of interfering with our business" was false or misleading. However, this is a factually accurate statement, as Mr. Awada himself admitted:

> Q:  Did you use a felt, after the judge told you that you couldn't use Exhibit 13 in connection with your placements, at some of the other casinos where you've placed Play Four Poker since the 2005 Gaming Show?
>
> MR. AWADA:  Yes, we have.  After the gaming show, yes at the casinos we did.

(Ex. J, Awada Dep. at 146:10-16; *see also* Ex. U, Awada Decl. ¶¶ 2-3 (discussing placements of games after gaming show)).   Thus, the statements made in Mr. Yoseloff's letter are entirely true.[16] Therefore, Defendants cannot even make out the first element of an unfair competition action under the Lanham Act—establishing that a statement in question is false.   Accordingly, the Court should dismiss this claim.

**B.      Defendants Have No Proof Regarding Statements Allegedly Made by Shuffle Master in Gaming Today and WallSt.net.**

Defendants' Interrogatory response also asserts that "False statements claiming Shuffle Master had a patent on four card poker were also made to Gaming Today (exact date unknown) and WallSt.net (exact date unknown)."   (Ex. F at 14, Answer to Interrog. No. 24.)   Notably, this contention does not even specify that Shuffle Master made such statements, only that they "were made" by someone. (*Id.*)

---

[16]   The latter part of the sentence, regarding GEI's intention, is a statement of Shuffle Master's subjective belief, which is not capable of "being reasonably interpreted as a statement of objective fact," and is therefore not actionable under the Lanham Act. *Coastal Abstract Service,* 173 F.3d at 731.

More importantly, Defendants have not produced *any* evidence of the statements that were allegedly made, despite being ask to do so in discovery.   Defendants were asked to produce "[a]ll documents and things . . . mentioned or reviewed . . . in the preparation of Defendants Answers to Shuffle Master's" Interrogatory No. 24.   (Ex. A, at 2 (Doc. Request No. 25).)   However, no documents containing alleged statements in Gaming Today or WallSt.net were ever provided. (Mowatt-Larssen Decl. ¶ 13.)  As such, Defendants simply cannot provide credible evidence as to by whom, when or where such statements were made, much less that such statements were false. Indeed, there would be no way for a factfinder to reasonably conclude that the statements were made at all without the underlying statements themselves.   Shuffle Master therefore is entitled to summary judgment on this portion of Defendants' Lanham Act unfair competition claim as well.

> **C.**     **Shuffle Master's Website Does Not Claim That Shuffle Master Has a Patent on Four Card Poker.**

Defendants' final allegedly false statement is that "Shuffle Master's own website falsely claims that they have a patent on four card poker." (Ex. F at 14, Answer to Interrog. No. 24.)  Again, despite being asked for documents substantiating this assertion (Ex. A at 3 (Doc. Req. No. 25)), Defendants provided none.  (Mowatt-Larssen Decl. ¶ 13.)

However, in the interest of resolving fully this allegation, Shuffle Master itself has reviewed its website to discern whether there is any statement that Shuffle Master "ha[s]  a patent on four card poker."  (Mowatt-Larssen Decl. ¶ 14.)  Shuffle Master found four instances of statements describing this litigation or events related hereto.  In the first two, Shuffle Master accurately describes the instant proceedings, including the initial lawsuit (Mowatt-Larssen Decl., Ex. 4) and the Court's grant of a temporary restraining order (Mowatt-Larssen Decl., Ex. 5).   In these press releases, the word "patent" is not even mentioned, except in boilerplate disclaimer language regarding forward-looking statements.   As for the other two instances, the litigation is referenced on the far right sidebar, but the only mention of patents there is concerned with "rumors that our Four Card Poker game infringes upon [another person's] paten. [*sic*]" (Mowatt-Larssen Decl., Exs. 6, 7.)  There is no question that none of these web pages contains a claim by Shuffle Master that it "has a patent on four card poker."

As such, Defendants cannot prove that the allegedly false statements were even made by Shuffle Master.

## VI.   DEFENDANTS CANNOT ESTABLISH INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE.

Defendants state law claims are also without merit.  Under Nevada law, to establish the tort of intentional interference with prospective economic advantage, Defendants must prove each of the following elements:

(1) a prospective contractual relationship between the plaintiff and a third party;

(2) knowledge by the defendant of the prospective relationship;

(3) intent to harm the plaintiff by preventing the relationship;

(4) the absence of privilege or justification by the defendant; and

(5) actual harm to the plaintiff as a result of the defendant's conduct.

*Wichinsky v. Mosa*, 847 P. 2d 727, 729-30 (1993).  But, Defendants simply cannot make out this claim because they have no evidence supporting elements 1, 2 and 3.  As such, Defendants' Third Claim for Relief should be dismissed.

### A.   Defendants Cannot Establish Prospective Contractual Relationships With Any Third Parties.

After their first counterclaim was dismissed for lack of specificity,[17] Defendants identified the following prospective contractual business relationships as allegedly having been interfered with by Shuffle Master:  Harrah's, Chukchansi Gold, Pechanga, and Sycuan casinos.  (Docket No. 97, Second Am. Countercl. ¶ 27.)  But Defendants must do more than make such allegations; they must provide evidence of a prospective contractual relationship.  *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000).  Yet, when asked to provide "all factual bases supporting" such allegations, Defendants did not provide any substantiation of the prospective relationships

---

[17]   This Court granted Shuffle Master's motion to dismiss without prejudice and granted Defendants leave to amend their intentional interference counterclaim because Defendants' original claim was "weak and generalized" and "fail[ed] to set forth the necessary elements."  (Docket No. 96, Order at 10.)  Defendants responded by alleging that they had a prospective business relationship with several casinos and/or gaming institutions.  (Docket No. 97, Second Am. Countercl. ¶ 27.)

recited in their complaint, and in fact did not list even these casinos as having prospective

relationships that were disrupted.  (Ex. F at 4-5, Answer to Interrog. No. 11.)

Rather, Defendants stated the following:

> Shuffle Master's website states that someone was copying their four card poker game.
> Upon information and belief, Shuffle Master employees are [1] telling their customer
> [*sic*] that they cannot place [Defendants' Play Four Poker game] on the floor because
> the game is their intellectual property.  [2] Mark Yoseloff visited GEI's booth at the
> Gaming Global Expo in 2005 and accused GEI of "stealing and copying" Shuffle
> Master's game.  [3] Mark Yoseloff followed up his disparaging remarks made at the
> Gaming Global Expo with letters that were sent to all of GEI's potential customers
> stating that GEI misappropriated their intellectual property rights by copying their four
> card poker game, and asking that gaming customers not deal with the "knock-off
> artist" GEI.  [4] Shuffle Master's director of Game Development, Roger Snow, sent
> similar correspondence accusing GEI of "piracy" and claiming that GEI violated
> numerous laws by marketing their PFP game.  Shuffle Master is aware that they do not
> own the patent for four card poker, and that Kings Gaming Inc. developed the concept
> prior to Shuffle Master copying their concept.

(Ex. F at 4-5, Answer to Interrog. No. 11.)

Additionally, Defendants failed to identify any witnesses from those casinos who could

substantiate the alleged prospective relationships.  (Ex. K, Defs. Initial Disclosures.)  And, despite

Shuffle Master's request for "all communications between [customers whose relationships Defendants

claim Shuffle Master has interfered with] and Defendants that took place" one year before and after

the alleged interference, Defendants have not produced a single contract or any documentary

evidence of prospective business relationships with any of these casinos.  (Mowatt-Larssen Decl. ¶

10.)  Quite simply, Defendants have provided no evidence to establish this required element and, as

such, this claim should be dismissed.  *See Nadel* at 382 (granting summary judgment dismissing

counterclaim for intentional interference and concluding that allegations based only on suspicions and

speculation "cannot suffice to support a claim for tortious interference"); *Gleason Works v. Oerlikon*

*Geartec, AG*, 141 F. Supp. 2d 334, 343 (W.D.N.Y. 2001) (district court granting summary judgment

dismissing counterclaim for intentional interference, holding that, without a link between the alleged

actions of the patentee and the claimant's injury, tortious interference was not shown).

**B.     Defendants Cannot Establish That Shuffle Master Had Knowledge of Any of the Defendants' Alleged Prospective Relationships.**

Even if Defendants could show that they had prospective relationships with Harrahs, Chukchansi Gold, Pechanga Casino and Sycuan Casino, they would still have the burden of showing that Shuffle Master and Mr. Yoseloff were aware of those relationships.  Defendants have sought no discovery on this topic, and, as the attached affidavit shows, Shuffle Master and Mr. Yoseloff specifically deny knowledge of these alleged prospective relationships.   (Yoseloff Decl. ¶ 8.)   Additionally, Defendants have not identified anyone from these casinos as witnesses, (Ex. K, Defs. Initial Disclosures), and, therefore, cannot provide evidence from those individuals as to Shuffle Master's alleged knowledge of GEI's alleged prospective relationships.   As such, Defendants cannot establish this required element, and their claim should be dismissed.

**C.     Defendants Cannot Establish the Required Bad Faith Intent on the Part of Shuffle Master.**

Obviously, because Defendants cannot establish the alleged prospective relationships or Shuffle Master's knowledge thereof, there is no way that Defendants can establish that Shuffle Master intended to harm those relationships.  And, even if Defendants could prove those elements, they could not make out the required showing of intent, which in this instance is met only by showing bad faith.

The Ninth Circuit has held that the standard of intent for a tortious interference claim "requires a state of mind and a purpose more culpable than ordinary 'intent'" under tort law, which "ordinarily imputes to an actor the intention to cause the natural and probable consequences of his conduct."  *DeVoto v. Pacific Fidelity Life Ins. Co.*, 618 F.2d 1340, 1348 (9th Cir. 1980).  Thus, in a tortious interference claim, "[t]he fact of a general intent to interfere, under a definition that includes imputed knowledge of consequences, does not alone suffice to impose liability."  *Id.* 618 F.2d at 1348.  The Nevada Supreme Court has adopted the holding of *DeVoto*, and has further established that a party asserting an intentional interference claim must obtain and provide evidence about the accused interferer's state of mind, stating that *"[i]nquiry into the motive or purpose of the actor is necessary."  J.J. Industries, LLC v. Bennett*, 71 P.3d 1264, 1268 (Nev. 2003) (emphasis in original) (quoting *DeVoto* at 1348).

Here, Defendants have not made *any* inquiry into the state of mind of Shuffle Master, or Mr. Yoseloff.  They have not deposed any Shuffle Master witnesses, and none of their interrogatories concerns the intent of anyone at Shuffle Master who allegedly engaged in the conduct listed above. (Mowatt-Larssen Decl. ¶¶ 7, 12.)  As such, they cannot establish bad faith on the part of Shuffle Master and their tortious intereference claim should be dismissed.

## VII.    DEFENDANTS CANNOT PUT FORTH THE REQUISITE EVIDENCE TO SUPPORT THEIR CLAIM OF TRADE LIBEL.

Defendants' final claim is related to trade libel and it is also meritless.   In their amended complaint, Defendants averred vague descriptions of allegedly "false statements" that Defendants claimed were "known to be false . . . or made in reckless disregard of the falsity of the statements, [and] made . . . with malice and in bad faith." (Docket No. 97, Second Am. Countercl. ¶¶ 33-34). But, under the Second Restatement of Torts, trade libel[18] requires a showing that Shuffle Master

(1) made a statement that disparages the quality of the [claimant's] product;

(2) that the offending statement was couched as fact, not opinion;

(3) that the statement was false;

(4) that the statement was made with malice; and

(5) that the statement resulted in monetary loss.

*OptInRealBig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1048 (N.D. Cal. 2004); *see also* Restatement (Second) of Torts, §§ 623A, 626 (1977).   Defendants fail to establish any of the requisite elements of trade libel, because they have set forth no evidence of what statements Shuffle Master made nor whether they were made with malice.

Shuffle Master provided Defendants with a detailed Interrogatory, Number 25, asking Defendants to "identify specifically each separate false and disparaging statement, including the specific date (or dates) that each such statement was made, who made it, to whom it was made, what

---

[18]   Because Shuffle Master is not aware of Nevada authority regarding the tort of trade libel, it cites the Second Restatement of Torts and case law from jurisdictions that follow that authority.

1  exactly was stated, and all documents or things Defendants contend demonstrate any of the

2  foregoing."   In response, Defendants offered a boilerplate litany of objections, which also pointed to

3  its initial disclosures and documents Defendants had produced, the sum total of which was 160 pages.

4  (Ex. F, Answer to Interrog. No. 25.)  However, the only substantive answer Defendants offered was

5  as follows: "Shuffle Master its [*sic*] referred to in Answer Interrogatory No. 25" [*sic*].  (*Id.*)  This

6  barely comprehensible statement provided absolutely no information — the interrogatory requesting

7  Defendants' contentions was number 25, and the answer refers internally to the response itself.  With

8  no evidence to speak of, Defendants' claim should be dismissed outright.

9        Defendants will likely argue that they intended to refer to their response to Interrogatory

10  No. 24, which sought similar information pertaining to the allegedly false statements underlying

11  Defendants' Lanham Act claims.  While Shuffle Master does not concede Defendants can, after the

12  close of discovery, retroactively re-write their interrogatory responses, Shuffle Master maintains that,

13  to the extent that interrogatory response No. 24 is considered, it is insufficient to allow Defendants'

14  trade libel claim to survive.  As discussed in Section V-B, *supra*, the statements Defendants point to

15  in response to Interrogatory No. 24 are either not false, or were never made at all.  Thus, Defendants'

16  trade libel claim must fail as well.

17        **A.      Defendants Have Offered No Evidence that Shuffle Master's Statements Were
          False or Made With Malice.**

18

19        Even if Defendants had identified statements that were made and were false, they would also

20  be required to show that Shuffle Master made such statements with malice.  *OptInRealBig.com*, 323

21  F. Supp. 2d at 1048; *see also* Restatement (Second) of Torts, §§ 623A, 626 (1977).  But Defendants

22  cannot do so.

23        Defendants, having taken no depositions nor propounded any interrogatories on the subject of

24  intent, never inquired into the state of mind of any Shuffle Master's employees.   Thus, they cannot

25  proffer a single piece of evidence showing that Shuffle Master "entertained any doubts about the

26  veracity of [its] statements or otherwise acted in reckless disregard of their accuracy."  *See Gen.*

27  *Products Co. v. Meredith Corp.*, 526 F. Supp. 546, 553-54 (E.D. Va. 1981) .  More importantly,

28  Mr. Yoseloff himself has provided affirmative evidence that the statements made in the Shuffle Master

correspondence were true, and he believed them to be so when he made them.  (Yoseloff Decl. ¶ 7.)  Defendants will no doubt argue that they themselves believe that Shuffle Master acted in bad faith.  "A belief is insufficient, however, to survive a motion for summary judgment."  *Marley*, 38 F. Supp. 2d at 1086.  This Court should therefore dismiss Defendants' trade libel claim.  *See Gen. Products Co.*, 526 F. Supp. at 554 (granting summary judgment dismissing trade libel claim and concluding that claimant produced no evidence of falsity or reckless disregard of falsity).

      **B.**       **Defendants Cannot Show the Requisite Special Pecuniary Damages.**

      For yet another, independent reason, Defendants' trade libel claim must fail.  "Unlike ordinary defamation actions, an action for product disparagement requires special damage in all cases."  *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004) (quotation omitted).  Claimants must "allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication."  *Id.*  Defendants have not produced any evidence of diminution in their business or of injury to their relationships with specific customers, let alone that Shuffle Master's statements caused such diminution or injury.  Defendants' trade libel claim thus fails as a matter of law.  *See Gee v. Pima County*, 612 P.2d 1079, 1080 (Ariz. App. 1980) (granting summary judgment dismissing trade libel claim, concluding that claimant failed to proffer evidence of special damages).  Accordingly, the Court should dismiss it.

**VIII.   CONCLUSION.**

      For all of the foregoing reasons, Shuffle Master respectfully requests that this Court GRANT Shuffle Master's Motion for Summary Judgment of Defendants' Counterclaims.

                       \*     \*     \*

1    Dated:  December 15, 2006                    Respectfully submitted,

2

3                                                 _/s/ Barry F. Irwin_____
4                                                 TAMARA BEATTY PETERSON
                                                  JONES VARGAS
5                                                 3773 Howard Hughes Parkway
                                                  Third Floor South
6                                                 Las Vegas, Nevada 89109
                                                  Telephone: (702) 862-3300
7                                                 Facsimile:   (702) 737-7705

8
                                                  BARRY F. IRWIN (Bar No. 9068)
9                                                 JAMI A. JAROSCH
                                                  *(Admitted Pro Hac Vice)*
10                                                KIRKLAND & ELLIS, LLP
                                                  200 East Randolph Drive
11                                                Chicago, Illinois  60601
                                                  Telephone:  (312) 861-2000
12                                                Facsimile:   (312) 861-2200
13
                                                  *Attorneys for Shuffle Master, Inc. and*
14                                                *Counter-Defendant Mark Yoseloff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 15th day of December, 2006, a true and correct copy of the foregoing, **SHUFFLE MASTER'S MOTION FOR SUMMARY JUDGMENT NO. 2 ON DEFENDANTS' COUNTERCLAIMS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**, was served via the Court's ECF notice on:

Sheri Schwartz, Esq.
LEWIS BRISBOIS BISGAARD & SMITH LLP
400 S Fourth St, Ste 1200
Las Vegas, NV  89101
(702) 893-3383 (t)
(702) 893-3789 (f)

/s/ Lesley Ahlberg_
An employee of Kirkland & Ellis LLP